UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

REBECCA SMITH,

        Petitioner,

v.

MILLICENT WARREN,

        Respondent.

_____/

CASE NO: 2:11-cv-10439
HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE
HONORABLE MONA K. MAJZOUB
UNITED STATES MAGISTRATE JUDGE

**Answer in Opposition to Petition for Writ of Habeas Corpus**

**Introduction**

Respondent holds Petitioner in custody pursuant to a second-degree murder conviction.

Petitioner is currently serving a sentence of 25 to 60 years' imprisonment.  Petitioner

commenced this action under 28 U.S.C. § 2254 by filing a petition with this Court.  Respondent

understands the petition to be raising the following claims[1]:

    I.      Petitioner was denied her right to a fair trial (due process) when a police
          witness testified that she lied to him and, therefore, he believed her to be
          untrustworthy.

    II.     Petitioner was denied her right to a fair trial (due process) when the
          investigator she had hired, who had previously worked for the same police
          agency as the investigating detectives, opined that they were effective,
          qualified, did not improperly file leads and were competent "[i]n a general
          sense," noting that he had not read their case file.

    III.    The state trial court abused its discretion when it admitted evidence that
          Petitioner had written letters to her long-time friend and sister, urging
          them to prepare anonymous false confession letters, containing previously

_____

[1] Should the Court interpret the petition to be raising different claims, Respondent requests an
opportunity to file a supplemental pleading.

unreleased details surrounding the murder, and send them to the
newspaper, the state trial court judge and her retained trial counsel.

Respondent now answers the petition and requests that it be denied because Petitioner's
first two claims are not exhausted and are procedurally defaulted.  Her third claim is not
cognizable, and, in any event, all of her claims are without merit.

Respondent also opposes any and all requests for discovery, evidentiary hearings, bond,
oral argument, or any other relief, including a certificate of appealability.  Furthermore,
Respondent opposes any factual assertions made by Petitioner that are not directly supported by
the State record, since Petitioner has failed to overcome the presumption of factual correctness
under 28 U.S.C. § 2254(e)(1) or meet the requirements of 28 U.S.C. § 2254(e)(2).

## Statement of the Case

A.    Trial Facts

*The murder victim's body is discovered*

At noon on Thursday, December 19, 2002, Oakland County Sheriff's Department Deputy Michael Carolin was dispatched to Oak Hill Road near east Holly Road in Michigan where there was a dead body.  (TT 10/29/07, 64-65).  A man, who had been collecting bottles, found the victim's body in a ditch.  (TT 10/29/07, 65-66).

Photographs of the area and victim's body were admitted and are attached as Appendix A.[2]  (TT 10/29/07, 68-69).  The victim's body was clad only in a white T-shirt.  (TT 10/29/07, 70).  Deputy Carolin checked for vital signs, stating that the body was cold and that he saw an injury to the lower chest area.  (TT 10/29/07, 70-71).  Deputy Carolin blocked off the scene as other investigators arrived.  (TT 10/29/07, 71-73).

Oakland County Sheriff's Department Deputy John Ashley, from the aviation unit, videotaped the crime scene from the air.  (TT 10/30/07, 13-14).  And, Oakland County Sheriff's Department Detective-Sergeant David Wurtz, who also went to the scene, opined that the body had been dumped the night before because of the animal damage[3] and the fact that it was partially-frozen even though the evening before had been rainy and unusually warm.  (TT 11/2/07, 45-46, 50; TT 11/5/07, 70).

Oakland County Sheriff's Department forensic specialist William Foreman also went to the scene, finding the male victim, who was wearing a bloody Detroit Tigers' T-shirt and had a hole in his chest as well as one in his side.  (TT 10/30/07, 55-56, 73, 81).  There was water on the

---

[2] The photographs are copies from the Court of Appeals and are in black and white.  Respondent has covered the victim's buttocks area in one of the photographs.

[3] An animal had gnawed on the victim's nose, eye and pinky finger after his body was put in the ditch.  (TT 10/29/07, 139-140, 162).

3

roadway where the body was found, but no fibers on it.  (TT 10/30/07, 81, 86).  Foreman collected cigarette butts at the scene and they were tested for DNA, but none matched Petitioner.  (TT 10/30/07, 70-71, 73, 116).  Foreman's assistant also took one footprint cast.  (TT 10/30/07, 73-74).

Hoping to discover the victim's identity, Detective Wurtz shared the photograph of a tattoo from the body with media outlets.  (TT 11/2/07, 51-53).

*The murder victim is identified and Petitioner tells her first story, which the police determine is false*

On December 20, 2002, Jackie Jordan, Petitioner's mother, was watching the news and saw the tattoo.  (TT 11/1/07, 265-266, 290-292, 300).  Jackie Jordan called Petitioner and asked her where her husband Michael Smith was.  (TT 11/1/07, 266-267, 292).  Petitioner stated that he was on his way to Florida and had left on a bus a couple of days earlier.  (TT 11/1/07, 266-267, 292, 296-299, 301).  Petitioner never told either her mother or father that Michael was missing and had not arrived in Florida.  (TT 11/1/07, 202, 268).  Instead, Petitioner asked why her mother wanted to know.  (TT 11/1/07, 292).  Petitioner's mother told her that she thought that Michael was dead.  (TT 11/1/07, 292).

Petitioner called the police and was transferred to Detective Wurtz.  (TT 11/2/07, 53-54).  Appendix B.  At that time, Petitioner reported:  "To make a long story short I kicked him out last Tuesday and I dropped him off at the bus station in Royal Oak."  (TT 11/2/07, 54).  Appendix B.

Wurtz asked Petitioner if Michael had ever been arrested and it turned out that he had been arrested for drunk driving.  (TT 11/2/07, 55).  Wurtz had the fingerprint information forwarded to the medical examiner's office and Michael's identity was confirmed.  (TT 11/2/07, 55).

Detective-Sergeant Wurtz and Michael Elliott went to Petitioner's house to tell her that Michael was dead.  (TT 10/29/07, 82-83, 90, 97; TT 11/2/07, 57-58).  Petitioner, whose sister was with her, appeared visibly upset and the police had to get her a basket because she appeared to have the dry heaves.  (TT 10/29/07, 91-93).  Even so, Petitioner agreed to answer questions.  (TT 10/29/07, 84).  After regaining her composure, Petitioner told them about Michael's job, his alcohol problems and his trip to Florida as well as their eviction and marital problems.  (TT 11/2/07, 58-60).

Petitioner also told the police that she had picked up Michael from work on Tuesday, December 10, 2002.  (TT 10/29/07, 85, 98-99).  They went to their home in Berkley and from there she drove him to the bus station in Royal Oak, dropping him off at the McDonald's parking lot across the street.  (TT 10/29/07, 85, 92, 98-99; TT 11/2/07, 60-61).  Michael had a military sea bag and a sport bag with a logo like Adidas.  (TT 11/2/07, 95).  Being familiar with that location, Wurtz knew that there was closer parking with easier access than the McDonald's parking lot, which required Michael to walk around a wall.  (TT 11/2/07, 61-62, 82).

According to Petitioner, Michael told her that they would work things out as they always had.  (TT 11/2/07, 82, 95).  Petitioner did not see Michael board a bus because she left after dropping him off.  (TT 10/29/07, 85-86).  Petitioner claimed that Michael had gone to Florida to receive help for his alcohol addiction.  (TT 10/29/07, 87, 92-93, 95).

The next day, Wednesday, December 11, 2002, Petitioner called Chrysler Jeep, where Michael worked, and told them that Michael had quit and gone to Florida.  (TT 10/29/07, 88).

Petitioner then informed the police that on Saturday, December 14, 2002, Michael's mother had called her from Florida to report that he never arrived.  (TT 10/29/07, 87, 93).

5

When the police investigated on Saturday, December 21, 2002, they determined that no one had seen Michael at the bus station and that he did not buy a ticket at 7 or 7:30 p.m., after Petitioner claimed she had dropped him off.  (TT 10/29/07, 107-108, 111-112).

*The autopsy*

Chief Deputy Oakland County Medical Examiner Kanu Virani performed Michael's autopsy on Friday, December 20, 2002.  (TT 10/29/07, 135-136, 138).  It was apparent that Michael had been left on his back for a period of time and was moved to where he was found face down.  (TT 10/29/07, 139).  The pattern on Michael's back, which was photographed and shown to the jury, indicated that he was resting on something that was not quite smooth.  (TT 10/29/07, 140, 142-143, 159, 166).

Because Michael was partially frozen, Dr. Virani had to wait until the following day to finish his autopsy.  (TT 10/29/07, 139, 164-165). Dr. Virani told Detectives Wurtz and Gary Miller that Michael had been outside for a night or two and that he had *not* died where he was found.  (TT 10/29/07, 150-151, 158).  Michael's body did not show evidence of decay that would normally occur after three or four days if a body was left at room temperature.  (TT 10/29/07, 174).

Michael was wearing the T-shirt he was found in when he was shot.  (TT 10/29/07, 139, 158).  Michael's T-shirt was drenched in blood.  (TT 10/29/07, 139, 154-155).  There was no visible gunpowder residue on that T-shirt, meaning that the gun was not fired at close range (*i.e.,* less than 2½ feet away).  (TT 10/29/07, 139, 156, 167-168).

One of the bullets went through the right side of Michael's abdominal area.  (TT 10/29/07, 139, 141-142).  It traveled from the back through the abdominal wall, liver, pancreas and ended up in the spleen on the other side.  (TT 10/29/07, 146-147).  That bullet traveled right

to left in an upward direction and slightly to the back.  (TT 10/29/07, 146-147).  Dr.  Virani recovered it from Michael's spleen.  (TT 10/29/07, 147).

Michael was also shot in the upper left chest near his nipple.  (TT 10/29/07, 139, 143-144); Appendix C.  That bullet, which was flat-nosed and covered with nylon material, went into Michael's heart and stopped.  (TT 10/29/07, 146).  It also traveled from front to back, slightly downward and to the left and side of Michael's body.  (TT 10/29/07, 146).  It caused damage to the heart and bleeding around the heart sac.  (TT 10/29/07, 146).  Michael did not live more than a minute after being shot in the chest.  (TT 10/29/07, 147-148).

Despite suffering gunshot wounds, Michael did not necessarily bleed heavily.  (TT 10/29/07, 150).  And, the toxicology screen revealed that Michael had no alcohol or drugs in his system.  (TT 10/29/07, 148, 152-153); Appendix D.  Michael's body was examined for evidence of sexual assault and none was found.  (TT 11/1/07, 208-209).  Dr.  Virani's autopsy protocol was admitted as is attached as Appendix D.  (TT 10/29/07, 144-145).

> *The victim's family, Petitioner's decision to quickly cremate the victim, and the later memorial service*

Sarah Louise Settlemires, Michael's mother testified, that on a Saturday in late November or early December, 2002, Michael called, telling her that he wanted to work on his alcohol problem and asking her to buy him a plane ticket so that he could come to Florida.  (TT 10/29/07, 113-115, 127-128, 132-133).  Settlemires agreed.  (TT 10/29/07, 114-115).  The following day, Michael called Settlemires again, telling her that he had changed his mind, stating he wanted to spend the holidays with his children.  (TT 10/29/07, 116-117, 133).

On December 14, 2002, Settlemires called Petitioner at Petitioner's parents' or grandparents' house and Petitioner's sister answered the telephone.  (TT 10/29/07, 117, 124).

7

Settlemires was calling to see if Petitioner's family had received the gift certificates she had sent them for Christmas.  (TT 10/29/07, 118, 131).

Thereafter, Petitioner called Settlemires.  (TT 10/29/07, 118).  During the telephone call, Settlemires asked about Michael and Petitioner stated:  "[H]e's not there?"  (TT 10/29/07, 118, 126).  Settlemires told Petitioner that Michael was not there and asked Petitioner if he was supposed to be there.  (TT 10/29/07, 118).

Petitioner asked Settlemires to call her if she heard from Michael and Petitioner promised to call Settlemires if she heard anything.  (TT 10/29/07, 119).  Michael had not called Settlemires to tell her he had changed his mind about coming to Florida.  (TT 10/29/07, 118-119).

Reverend Duane Chassie was the executive director of Youth Challenge in Wildwood, Florida, an 18-month residential program for drug and alcohol abuse.  (TT 11/1/07, 203).  Michael had attended Chassie's program when he was 18.  (TT 11/1/07, 204).  In 2002, Michael called and Chassie agreed to accept him; later, however, Settlemires called to say that Michael wasn't coming.  (TT 11/1/07, 204-205, 207).

On Friday, December 20, 2002, Petitioner called Settlemires to tell her that Michael was dead.  (TT 10/29/07, 119, 122).  Petitioner told Settlemires that she was having Michael cremated the next day.  (TT 10/29/07, 120, 124).

Johnny Veal, Michael's brother, testified that he and Michael were very close.  (TT 10/29/07, 220, 222).  In 2002, Veal was living in Flint, Michigan.  (TT 10/29/07, 220-221).  Veal would loan Michael money to pay bills if he needed it.  (TT 10/29/07, 224).

Tina White, Michael's sister, testified that when Michael visited Florida, he stayed with her.  (TT 10/29/07, 235-236).  Michael told White that he and Petitioner were having marital

problems.  (TT 10/29/07, 238).  Michael did not mention coming to Florida in December, 2002.
(TT 10/29/07, 236-237).

White was preparing to come to Michael's memorial service in Michigan, but Petitioner
called her and told her that Michael would be cremated before they arrived.  (TT 10/29/07, 241-
242).  Even though White asked to be able to see Michael one last time, Petitioner reported that
the state was cremating Michael and that it had to be done immediately.  (TT 10/29/07, 242-
244).

Penny Smith, who had previously been married to Michael, testified that sometime
around Thanksgiving 2002, Michael called her and asked to move in, telling her he was
divorcing Petitioner.  (TT 11/1/07, 163, 171-173, 178-179).  Michael was going to enter an
alcohol rehabilitation program.  (TT 11/1/07, 178-179).  Penny, who was in a relationship
someone else, declined Michael's invitation to reconcile.  (TT 11/1/07, 172, 179).

According to Penny, Michael drank a couple of times a week.  (TT 11/1/07, 174).  Penny
noted that Michael wet the bed, doing so even when he was sober.  (TT 11/1/07, 174-175).

On the Sunday after Michael's body was discovered, Petitioner called, calmly explaining
that Michael had gone to Florida after she had dropped him off.  (TT 11/1/07, 164-165).
Settlemires called Petitioner and she learned that Michael was not in Florida.  (TT 11/1/07, 165).
Petitioner called the police.  (TT 11/1/07, 165).

When Penny inquired about a memento for her daughter with Michael, Petitioner stated:
"[N]o.  I don't have anything left of his.  I threw all of his shit in the dumpster."  (TT 11/1/07,
162-163, 166, 171, 175).

Petitioner also admitted lying to the police, stating that she did not want the police to
judge her because she took Michael back.  (TT 11/1/07, 167-169).

9

In February, 2003, Settlemires had a memorial service for Michael.  (TT 10/29/07, 122-123).  Petitioner and Michael's brother Johnny Veal drove there together.  (TT 10/29/07, 226).  After the service, Veal and Penny saw Petitioner with Michael's favorite baseball cap.  (TT 10/29/07, 226-227, 233-234; TT 11/1/07, 169-170, 177, 179).  Neither believed that Michael would have gone to Florida without it.  (TT 10/29/07, 226-227; TT 11/1/07, 170).

*The victim failed to show up for work*

John Rossignol, Michael's employer at Village Chrysler Jeep, described Michael as a reliable and good employee.  (TT 10/29/07, 203-205).  Scott Butash, Michael's immediate boss and friend, also described Michael as a reliable employee, who had been promoted to his position.  (TT 10/29/07, 181-183).  Butash was the parts' manager and Michael was the parts' counter person.  (TT 10/29/07, 181, 195).  They both had work uniforms.  (TT 10/29/07, 187-188, 190-191).

On Monday, December 9, 2002, Michael, who was a Miami Dolphins' fan, called Butash to discuss the Monday Night Football telecast in which the Dophins were playing.  (TT 10/29/07, 184).

The following day, Michael and Butash were at work together.  (TT 10/29/07, 186).  Michael attended a 401(k) meeting.  (TT 10/29/07, 207).  Michael did not mention anything about going to alcohol rehabilitation in Florida.  (TT 10/29/07, 186).

On Wednesday, December 11, 2002, Michael did not come to work.  (TT 10/29/07, 186-187, 204).  Michael had a bi-weekly salary and received a monthly bonus commission.  (TT 10/29/07, 203-204).  Michael knew he was scheduled to receive his monthly bonus check for $804.  (TT 10/29/07, 206).

After waiting for Michael to show up, Butash called his home.  (TT 10/29/07, 187).

Petitioner told Butash that Michael had left for Florida on Tuesday night after she had taken him

to the bus station.  (TT 10/29/07, 187).  Butash was stunned.  (TT 10/29/07, 187).

Rossignol believed that Petitioner eventually picked up Michael's bonus check.  (TT

10/29/07, 209-210).

*The victim's blood is found in the couple's bedroom closet floorboards*

In August 2001, Donald Moore rented Petitioner and Michael their house in Berkley,

which had a detached garage.  (TT 10/30/07, 17-19, 53; TT 11/1/07, 291); Appendix E.

Petitioner's parents' house was next door and it was vacant at that time.  (TT 10/30/07, 42-46;

TT 11/1/07, 288, 291).  Like Petitioner's house, it had an unheated, detached garage.  (TT

11/1/07, 288, 291).

By July, 2002, the rent check bounced and, then, in September, 2002, a no-account check

was issued.  (TT 10/30/07, 19).  After speaking with the bank, Moore wrote a letter to Petitioner

asking her to bring the rent to him.  (TT 10/30/07, 20).  Petitioner left a note for Moore

indicating that her uncle had died, but that Moore would receive his money after October 14,

2002.  (TT 10/30/07, 20-21).  When Moore still wasn't paid, he began eviction proceedings on

October 16, 2002.  (TT 10/30/07, 21).

Moore obtained a default judgment on October 31, 2002.  (TT 10/30/07, 21).  Moore

called Petitioner to let her know that the sheriff would be coming to remove her.  (TT 10/30/07,

22).  Moore then obtained a writ of restitution on November 15, 2002.  (TT 10/30/07, 22).

Petitioner's father Mark Jordan helped Petitioner move on December 11 or 12, 2002.

(TT 11/1/07, 269).  Randy Parks was there along with Rachel, Petitioner's sister, and Mark

Jordan's uncle Jay Rockford.  (TT 11/1/07, 270).  Petitioner told police that she moved on the 11th.  (TT 11/2/07, 127-128).

After Petitioner moved out, Moore cleaned and painted.  (TT 10/30/07, 22, 36-37, 52).  Moore did not wash the floors.  (TT 10/30/07, 22-23).  It did not appear that Petitioner had painted the house or had professionally cleaned the rugs.  (TT 10/30/07, 35).

After Petitioner moved out, she repaid Moore.  (TT 10/30/07, 39-40).

Forensic specialist Foreman went to the rental house on January 10, 2003.  (TT 10/30/07, 23, 57, 74, 92; TT 11/2/07, 169).  Foreman drew two sketches of the home that are attached as Appendix F.  (TT 10/30/07, 60-62).  The home was being painted.  (TT 10/30/07, 58).

Foreman used luminol to detect blood and found a large area and a smaller area inside the bedroom closet that fluoresced.  (TT 10/30/07, 59, 64, 74-75; TT 11/2/07, 173-174).  The area measured 12" x 18".  (TT 10/30/07, 83).  The bedroom closet was two-feet deep and 60¾" wide.  (TT 10/30/07, 62-63).  A photograph of the closet was admitted and is attached as Appendix G.  (TT 10/30/07, 47-48).  The landlord recalled the closet door being removed.  (TT 10/30/07, 48).

Two sections of tongue-and-groove hardwood floorboards were removed from the closet.  (TT 10/30/07, 23-24, 48, 59, 65-66; TT 11/2/07, 174).  After the floorboards were removed, a photograph was taken and is attached as Appendix H.  (TT 10/30/07, 63).  The flooring was admitted.  (TT 10/30/07, 66-67).  The blood found therein was consistent with someone pushing it into that area in an attempt to wipe it away.  (TT 10/30/07, 68).

On January 13, 2003, Foreman returned a second time to test a new chemical.  (TT 10/30/07, 68-69, 91-92).  On January 16, 2003, Foreman returned a third time to collect more flooring, but there was no further reaction with the luminol.  (TT 10/30/07, 69, 79, 92).

Foreman also searched Petitioner's van for blood, but found none.  (TT 10/30/07, 79-80).

Michigan State Police Crime Laboratory biology program coordinator Dorothy Catella, a DNA expert, compared Michael's blood with four samples taken from wooden floor cuttings. (TT 10/30/07, 102-108, 117). The DNA from Michael's blood matched the four samples. (TT 10/30/07, 107-108; TT 11/2/07, 174).

On January, 2003, Catella went to the Berkley house to test a new product to detect blood in areas that had been painted; however, no further blood was found because the entire room fluoresced, presumably from the paint. (TT 10/30/07, 108-113, 117-119).

Detectives Wurtz and Miller returned to Dr. Virani, asking him if the position Michael had been found in was consistent with the dimensions of his bedroom closet. (TT 10/29/07, 151). Michael was 6' 4" tall and weighed 222 pounds. (TT 10/29/07, 160, 170); Appendix D. Dr. Virani agreed that it was. (TT 10/29/07, 151, 164-165). In addition, Michael could have bled from the wound in his side given the way his body was placed, causing the blood pattern found on the bedroom closet floor. (TT 10/29/07, 151-152, 165).

> *Petitioner's investigative subpoena testimony on May 12, 2003, wherein she discusses the victim's $200,000 life insurance policy and admits lying to the police as well as asking a friend for a gun to kill the victim because she wanted him dead*

Petitioner's investigative subpoena deposition taken on May 12, 2003 was read into the record. (TT 10/30/07, 121-123). Petitioner met Michael in Tennessee while they were in the Navy and they married on November 6, 1998. (TT 10/30/07, 128). Petitioner was only in the Navy for 15 months and was discharged because of her knees. (TT 10/30/07, 128-129; TT 11/1/07, 35-36). Petitioner was a parachute rigger and handled fuel for F-18s. (TT 11/1/07, 34). Petitioner was on medication for anxiety because they wanted her to do another job. (TT 11/1/07, 35). Petitioner claimed the fumes from the jets gave her migraines. (TT 11/1/07, 35).

The medication she was on made her drowsy and she ended up in a janitorial position. (TT 11/1/07, 35-36).

On Monday, December 9, 2002, Petitioner drove Michael to work. (TT 10/30/07, 132). Petitioner then went to her grandparents' house to ask them if she and the boys could stay with them or if her grandparents would be willing to pay for an apartment because they were being evicted. (TT 10/30/07, 132). Despite her landlord's testimony to the contrary, Petitioner claimed to be unaware of the eviction until after Thanksgiving. (TT 11/1/07, 68).

According to Petitioner, Michael was going to Wildwood, Florida [Reverend Chassie's program] for alcohol rehabilitation. (TT 10/30/07, 132-133). Michael had called his mother to make the arrangements for a plane ticket. (TT 10/30/07, 132-133). Quickly thereafter, Michael had changed his mind, deciding to spend the holidays with his family. (TT 10/30/07, 133).

At lunchtime, on December 9, 2002, Michael came to Petitioner's grandparents' house. (TT 10/30/07, 137, 143, 146). Petitioner and Michael went to their house and Michael began to pack. (TT 10/30/07, 137-138, 143). Petitioner did not tell Michael that her grandfather was going to be looking at an apartment with her, but led him to believe that she and the boys would be living with her grandparents, who did not get along with Michael. (TT 10/30/07, 138-139, 142). The couple's bank account was closed and Michael was supposed to be paying the rent, but he failed to do so. (TT 10/30/07, 140-142).

Petitioner left Michael at their home and then went with her grandfather to rent an apartment. (TT 10/30/07, 146). Petitioner's grandfather paid the rent for January, but Petitioner made the other payments. (TT 11/1/07, 72-73). Petitioner's grandfather stated that there was no way that Michael was setting foot in that apartment. (TT 11/1/07, 72). However, Petitioner maintained that she would allow Michael in if she wanted to. (TT 11/1/07, 72-73).

14

Petitioner returned home and began to pack.  (TT 10/30/07, 147).  That night, the boys stayed with Petitioner's grandparents.  (TT 10/30/07, 146-147).  Petitioner picked up Michael and, after they returned home, Michael packed a duffle bag and a sea bag.  (TT 10/30/07, 147, 152-153; TT 11/1/07, 52).  Michael packed one of his Bibles and his baseball cards.  (TT 10/30/07, 152).  Michael's bus was supposed to leave at 11 p.m.  (TT 10/30/07, 147).

That night, Michael was drinking during the football game.  (TT 10/30/07, 144).  Petitioner told him if he did not get help, she would not let him see the kids.  (ITT 10/30/07, 144).  Petitioner also threatened to divorce Michael.  (TT 10/30/07, 144).  Petitioner later testified that she did not see Michael drinking, but she assumed that he had done so because he smelled of beer and there were cans in the kitchen.  (TT 10/30/07, 149).

Petitioner, who suffered from migraines, went to lie down on her son's bed.  (TT 10/30/07, 147).  Petitioner asked Michael to wake her when it was time to leave.  (TT 10/30/07, 147).  Petitioner testified that she did not like to sleep in bed with Michael because he had previously urinated there and she thought that "it was gross."  (TT 10/30/07, 149).  Petitioner "hadn't slept" in the marital bed "in a long time."  (TT 10/30/07, 149).  According to Petitioner, at one point, they had garbage bags between the sheets and the mattress pad.  (TT 10/30/07, 150).

The next morning, Petitioner awoke and found Michael sleeping on the couch.  (TT 10/30/07, 147).  Michael stated that he had fallen asleep during the Dolphins' game, and had to go to work for a while.  (TT 10/30/07, 147, 150-151, 153).

After taking her son to school, Petitioner drove Michael to work.  (TT 10/30/07, 153-154).  Michael started work later on Tuesdays.  (TT 10/30/07, 154).  That day, Michael attended

the 401(k) meeting.  (TT 10/30/07, 151-152; TT 11/1/07, 79-80).  Petitioner did not know why he went to the meeting when he was leaving his job.  (TT 11/1/07, 80).

Petitioner spent some time packing with her sister.  (TT 10/30/07, 154; TT 11/1/07, 8).  Petitioner went to pick up her son from school and took him to her grandmother's.  (TT 11/1/07, 8).  Petitioner returned home to continue packing.  (TT 11/1/07, 8).

Later in the afternoon, Petitioner's grandfather called her to say that there was a bus at 3 p.m. and 7 p.m.  (TT 11/1/07, 8-9).  Petitioner called Michael and he decided to take the 7 p.m. bus.  (TT 11/1/07, 9-10).

Petitioner picked up Michael from work.  (TT 11/1/07, 10).  They went to their house and Michael grabbed the bags he had packed.  (TT 11/1/07, 10-11).  Petitioner didn't think about taking the bags with her when she went to pick up Michael from work.  (TT 11/1/07, 11).

Michael drove to the bus station.  (TT 11/1/07, 11).  Michael got out of the car.  (TT 11/1/07, 11).  Petitioner told him that they would make it through this like they always did.  (TT 11/1/07, 11).

Petitioner went to her grandmother's house.  (TT 11/1/07, 12).  Petitioner then went to her house to get diapers.  (TT 11/1/07, 12).

Later, Petitioner went to her house to meet up with Randy Parks, who was bringing his truck to help her move.  (TT 11/1/07, 13).  Petitioner's sister was with her.  (TT 11/1/07, 13-14).

Petitioner went inside and found Michael in the bedroom.  (TT 11/1/07, 14).  Michael asked if they could talk some more.  (TT 11/1/07, 14).  Petitioner was shocked, but asked her sister Rachel to wait for Parks and send him away because she wasn't moving anything that night.  (TT 11/1/07, 14, 37, 59-60, 65).  Petitioner didn't ask how Michael had gotten home.  (TT 11/1/07, 65).  Petitioner and Michael then talked for about one-half hour.  (TT 11/1/07, 14-15).

16

Petitioner slept on the couch while Michael slept in his bed.  (TT 11/1/07, 16).  Petitioner and

Michael were the only ones in the house.  (TT 11/1/07, 59).

Petitioner testified that she and Michael had not slept together since their youngest son

was born.  (TT 11/1/07, 16).  At that time, Petitioner's children with Michael were JS, who was

five, and CS, who was one and one-half.  (TT 10/29/07, 243; TT 10/30/07, 128).  According to

Petitioner, Michael either slept in his underwear or in the nude.  (TT 11/1/07, 16).

Petitioner's sister Rachel came over on Wednesday morning.  (TT 11/1/07, 17-18).

Petitioner sent her away, telling her that she had to take JS to school.  (TT 11/1/07, 18-19).

Petitioner took JS to school at 7:15 a.m.  (TT 11/1/07, 19).

When Petitioner got home, Michael was up and Scott Butash called.  (TT 11/1/07, 19).

Petitioner realized that Michael had not told his employer he was leaving.  (TT 10/30/07, 151-

152).  Petitioner told Butash that Michael had left for rehabilitation and told him what was going

on.  (TT 11/1/07, 19).  When Petitioner hung up the telephone, Michael stated that she had made

him "sound like an asshole".  (TT 11/1/07, 19).  Petitioner retorted: "[W]ell you've been acting

like an asshole." (TT 11/1/07, 19).  Michael said that they had to leave.  (TT 11/1/07, 19).

The last time Petitioner saw Michael was at 8:30 a.m. on Wednesday, December 11,

2002, at the bus station in Royal Oak.  (TT 10/30/07, 129; TT 11/1/07, 20, 74).  Petitioner

dropped Michael off across the street from the bus station in a parking lot.  (TT 11/1/07, 20-21).

Michael was wearing his work uniform.  (TT 11/1/07, 21, 52).

Petitioner did not know Michael's bus information.  (TT 10/30/07, 148; TT 11/1/07, 20).

Petitioner returned Michael's extra work uniforms a couple of days later.  (TT 10/30/07,

153-154).

On Saturday, December 14, 2002, Petitioner learned the Michael was not in Florida.  (TT 10/30/07, 145; TT 11/1/07, 21-23).  Petitioner believed that Michael had gone to Flint to stay with his brother.  (TT 11/1/07, 23-24, 76, 79).  Petitioner claimed that she did not have Johnny Veal's number.  (TT 11/1/07, 24).  Petitioner did not think that Michael's mother had Veal's number, but admitted that she did not ask.  (TT 11/1/07, 24-25).  Petitioner didn't call anyone, but later testified that she had been in contact with Michael's friends at the car dealership, who hadn't heard from him.  (TT 11/1/07, 25, 27).

On Monday, December 16, 2002, Petitioner expressed her concern to her grandparents and father that Michael had not gone to rehabilitation.  (TT 11/1/07, 25).

The following day, Petitioner talked to her long-time friend Kelly Cutean, indicating that Michael had never made it to Florida.  (TT 11/1/07, 76).

On Friday, December 20, 2002, Petitioner's mother called her, telling her about a report on Channel 4 about a body being found, clad in a Detroit Tigers' T-shirt and wearing a wedding band.  (TT 11/1/07, 25-26, 81-82).  The body had a tattoo of the Grim Reaper wearing a rebel flag that Petitioner's mother recognized as Michael's.  (TT 11/1/07, 26-27).

Petitioner turned on the news and, when she saw the report, including a photograph of the tattoo, she called information to get the number for the Springfield Township Police Department.  (TT 11/1/07, 26, 81-82).  Petitioner then called the police.  (TT 11/1/07, 28).

Later that morning, at about 9:30 a.m., the police came by, confirming that the body was Michael's.  (TT 11/1/07, 28).

At 6 or 7 p.m., Petitioner called Settlemires.  (TT 11/1/07, 28).  Petitioner claimed she had been trying to call, but the telephone numbers for Settlemires and Tina White were busy.  (TT 11/1/07, 28-29).

Even so, Petitioner called a life insurance agent to see if there were burial benefits. (TT 11/1/07, 30, 48). Petitioner was not sure if they had life insurance because they didn't pay the premium in December. (TT 11/1/07, 30). Michael's life insurance policy was worth $200,000.00. (TT 11/1/07, 48).

Petitioner had no idea who killed Michael. (TT 11/1/07, 30, 33).

That Saturday, December 20, 2002, Johnny Veal ran into Petitioner, who had stopped by the old house, to talk to the landlord. (TT 11/1/07, 30-31).

Petitioner admitted that she initially lied to police, but only about the day that Michael had left. (TT 11/1/07, 33). Petitioner did so because she did not want her family to find out. (TT 11/1/07, 72-74).

Petitioner did not own a gun. (TT 10/30/07, 129). Petitioner admitted that she had asked Randy Parks if she could borrow his gun in the summer of 2002, telling him that she was going to kill Michael. (TT 11/1/07, 66). Petitioner explained that she "was mad." (TT 11/1/07, 66).

The week that Michael left, Petitioner admitted thinking that, if she could shoot him, he would go away. (TT 11/1/07, 66-67). Petitioner told Parks that she wanted Michael "dead." (TT 11/1/07, 66).

Petitioner testified that if her grandfather had testified that Michael was leaving because he and Petitioner were divorcing, he was lying. (TT 11/1/07, 40-41). If Petitioner's grandfather testified that he had helped throw out the couple's mattress on Wednesday, December 11, 2002, he was mistaken because Petitioner and her sister had thrown it out. (TT 11/1/07, 45-46).

Petitioner claimed that she had kept most of Michael's things, but had thrown away others. (TT 11/1/07, 47-48). Petitioner agreed that she had called a thrift shop about Michael's

boots on Tuesday.  (TT 11/1/07, 71).  Petitioner stated that she told Michael that whatever he wasn't taking with him to Florida, she would throw away.  (TT 11/1/07, 71).

Petitioner testified that all of the witnesses who had testified under investigative subpoena had talked to her about their testimony, even though they had been instructed not to.  (TT 11/1/07, 56-57).  Petitioner agreed that after learning that investigative subpoenas had been sent out, she tried to determine who had received them.  (TT 11/1/07, 80-81).

Petitioner did not know how Michael's blood got into the grooves of the bedroom closet floor.  (TT 11/1/07, 57-59, 70, 83).  Petitioner only recalled one incident where Michael had bumped his head on the windowsill.  (TT 11/1/07, 57).  Petitioner denied cleaning up blood in the closet.  (TT 11/1/07, 70-71).  Petitioner admitted removing the door from the closet to take out a chest.  (TT 11/1/07, 70).

*What Petitioner tells others about the victim's murder*

After learning that Michael had been murdered, Petitioner's sister Dawn Kosut-Hembree called to ask if she could see her.  (TT 11/1/07, 130-132).  Kosut-Hembree went to see Petitioner.  (TT 11/1/07, 132).  Petitioner told Kosut-Hembree that her relationship with Michael was terrible, describing him as an alcoholic, who cheated on her.  (TT 11/1/07, 133).

Petitioner suggested that perhaps Michael had been murdered by someone who was upset that Michael was having an affair with that person's spouse, girlfriend, or boyfriend.  (TT 11/1/07, 134-135).  Petitioner also theorized that perhaps Michael had gone to a gay bar in Royal Oak.  (TT 11/1/07, 134-136).  Kosut-Hembree, however, rejected that theory because she had met Michael and was aware of his vocal opposition to homosexuality.  (TT 11/1/07, 135-136).

Petitioner also mentioned that Randy Parks may have killed Michael, telling  Kosut-Hembree that she and Parks had kissed years earlier.  (TT 11/1/07, 136-138).

After Petitioner learned that Michael's blood was found inside the closet, she told Kosut-Hembree that Michael had cut his hand when putting a cedar chest inside of it.  (TT 11/1/07, 138-139).  But when the police examined a wooden chest, they found no blood there.  (TT 11/1/07, 149-152, 154-156).

To Kosut-Hembree's knowledge, neither Petitioner nor Michael had a gun.  (TT 11/1/07, 141).

Kosut-Hembree admitted that Petitioner told her that she had initially lied to the police because she did not want her grandparents to know that she had allowed Michael to spend another night in their house.  (TT 11/1/07, 145-148).

Daniel Katzenstein, who was gay, was Michael's co-worker.  (TT 10/29/07, 213-214).  At one point, another co-worker named Tracy called Katzenstein and asked him to come over to

21

her place and tell Michael that they were going out because Michael was at her house and would not leave.  (TT 10/29/07, 214-217).  Still later, Katzenstein saw Michael at Pronto's, which was a restaurant as well as a gay bar.  (TT 10/29/07, 215-216).  Michael asked Katzenstein not to tell anyone that he was there, stating:  "I'm not like that."  (TT 10/29/07, 215).  Michael then tried to pick up a woman at the bar.  (TT 10/29/07, 215-218).  Katzenstein was surprised to see Michael at the bar because Katzenstein knew that Michael was heterosexual.  (TT 10/29/07, 215, 219).

Petitioner also talked to Brenda Mason, Michael's first cousin, the Easter after Michael's Florida memorial service.  (TT 11/1/07, 182-184).  Petitioner told Mason that she was afraid of Michael and complained that he cheated on her and drank.  (TT 11/1/07, 185).

Petitioner also told Mason that she thought that Michael was a closet homosexual.  (TT 11/1/07, 186-187).  Petitioner claimed that Michael asked for "strange things in bed," noting that they had not slept together for four months.  (TT 11/1/07, 187).

Petitioner repeatedly asked Mason to find out what Tina White, Michael's sister, knew about the investigation.  (IV, 200-201).  Petitioner knew that the police took a .38-caliber gun from her sister's husband's father.  (IV, 202).

> *After being arrested, Petitioner asks her long-time friend and sister to write anonymous false confession letters and mail them to the media, the state trial court and her retained attorney*

Kelly Cutean, one of Petitioner's friends, had known Petitioner for seventeen years.  (TT 11/1/07, 304-306).  Petitioner wrote Cutean and sent her a fax, asking her to take over Petitioner's finances and to write three letters confessing to Michael's murder.  (TT 11/1/07, 308).  Petitioner suggested that Cutean include one of Michael's baseball cards with the letters she was sending to the Oakland Press, Judge O'Brien, who was the state trial court judge, and

22

Petitioner's retained defense attorney.  (TT 11/1/07, 308, 311-312).  Petitioner's letter was

admitted and is attached as Appendix I.  (TT 11/1/07, 313).  It reads:

> Hey Sweetie!
> How are you? I definilly [sic? definitely] miss talking to you every day, but
> believe me, I understand.  I'm really nervous about Tuesday.  I have a feeling the
> chances of it just getting dismissed are slim.  And even if Im [sic?] granted Bond
> theres [sic?] like no money, so Im [sic?] fucked.  Which is why Im [sic?] writing
> you this letter.  I know this is really pushing the bounds of our friendship, but I
> wouldn't ask if I wasn't totally, helplessly desperate.  My point is I <u>will</u> <u>not</u>
> survive in here another three months until trial.  I can't handle it anymore.  I miss
> the boys <u>SO</u> much, and Im [sic?] scared for them that they will lose me forever.  I
> know I usually put on a tough front but honestly this is killing me, every day a
> little more.  I hurt so much.  I hate the people, food, general environment.  Its
> [sic?] unbearable.  Thats [sic?] why I need your help putting an end to it all.  I
> know what Im [sic?] asking is extreme but you are my only hope.  I was going to
> ask Rachel to do it, but she blew her knee out and is almost imobile [sic?] now.
> Im [sic?] asking you for you to draft three letters, one to the <u>Judge Colleen</u>
> <u>O'brien</u> [sic?], one to Mr.  Schulman [Petitioner's defense counsel], and one to
> the Oakland Press.  In these letters you would claim to be the one who did it.
> Enclosed is a script of the main points I think they should say.  Rachel I don't
> think could do it anyway, (not good at secrets.) no one will think of you.  The
> letter will talk about some of his belongings that he took with him, as verification.
> Don't get me wrong.  I <u>did</u> <u>not</u> <u>do</u> it.  I have no clue who did, but I need this all to
> end more at this point, than I need to know the truth.  Frankly, right now knowing
> what I do know, I don't care if I ever find out.  The events in this script are
> detailed to correlate with the reports I have.  The main things are: leave <u>no prints</u>
> on anything, use a different computer (no work or home) go to Kinkos [sic?] or
> something and mail from a stand alone mailbox (no cameras) Print address out on
> computer, then tape on.  No one will ever even think to look at you if it does get
> questioned.  Especially since we don't talk as often.  Please Im [sic?] begging
> you! My life is literally in your hands.  I can honestly say Id [sic?] do it for you.
> Rachel just cant [sic?] get away, and she feels bad.  I need to be with Josh +
> Charlie, please help me! And please don't be offended that Im [sic?] asking.
> Trust me you would too if you were me.
> Ive [sic?] never felt more desperate and hopeless in my whole life.  I need it taken
> care of ASAP.  Please help.  Throw away any extras you don't use (stamps, tape,
> etc.) To avoid prints you'll have to wear gloves when you fold them up.  To avoid
> when printing slide them into a folder or something with a pen.  But wear gloves
> when handling envelopes and everything, even when you mail them hold them
> with a tissue or something.
> Please, I realize what Im [sic?] asking, but especially after talking to the boys at
> my moms [sic?] the other day, I need to go home.  Youre [sic?] my only hope.  I
> love you.  If your [sic?] mad please don't cut me off from you either, I couldn't
> bear that.  Youre [sic?]  the only one true friend Ive [sic?] always had.

Ill [sic?] ask some mundane questions on the phone like about my banking to verify whats [sic?] going on.

I love you.

Please rescue me.  I'm not going to make it.

Becca

P.S.  Make sure this letter gets destroyed!  Shredded + burned!

P.P.S.  Obviously, this stays between us!  Please!

P.P.P.S.  If you think having a few of the cards to mail w/ the letters will help we'll find a way to get them from Rachel.  I know Im [sic?] asking the world of you, I'll make it up to you somehow.  But shit my hairs [sic?] falling out, I can't sleep or eat.  Please help me.  I love you.  I can't lose my boys.  Theres [sic?] other things happening here that I can't say.  If you do use the cards you have to wipe the prints off them too.


You can fill in the story as you see fit.  But say something like you met him the summer of 2002, at Sneakers in Ferndale.  You two developed a "relationship"! He was planning on leaving his family for you.  He first came home to you the night of Dec. 10, 2002 but decided he had some unfinished things to take care of. So you took him home and you guys had arranged for you to pick him up the next morning at 9 am [sic?] at McDonalds [sic?].  That first day was great he moved his stuff in, (you had made room in your closet + stuff)  He had accepted you for who you were and you him.  He had known you were a recovering junkie and you knew he had a drinking problem.  You both loved football + hunting.  You didnt [sic?] much care for baseball + Nascar like he did.  The next day it seemed everything had changed.  He was moody and read from his bible off + on all morning before you went to work that afternoon.  When you got home that night everything had changed.  He had repacked all his stuff and demanded you take him back to the Greyhound so he could go to rehab like he had told his wife.  He was saying that if he stayed he was going to hell and so were you for being a "homo".  You were devastated, you had made so many plans for the two of you, you had told him you would try + transfer to Florida so you guys could move there.

You have done 5 lines before you had come home so you were worked up anyway, you snapped, you went and got your gun out of the basement.  He met you in the kitchen.  You told him he'd leave over your dead body.  He came at you + you fired, he slowed up some but not enough to stop entirely + you fired again as you started to duck.  He went down.  All he said was "You Mother Fucker."  You know it only took a couple of minutes for him to die but it felt like forever.  You started to panic and wonder if anyone heard anything.  You ran around the house looking out of all the windows.  After ½ hour when no one came knocking you went to the garage to find something to wrap him in.  You found a tarp, brought him in the house and started to wrap him in it.  The sight of what you'd done made you puke.  You threw up beside him and some got on his pants so you took them off.  You needed time to figure out what to do with him.  So you ½ pulled half ½ carried him to the garage.  Your neighbors to the right of you were out of town so you weren't worried about being seen.  You left him in there

24

for 3 days while you went on a bender.  When you returned home on Sunday you decided to take him to your property up north.  Your truck had a cap so you used ramps to pull him up into the truck.  You were still kind of messed up and ½ way through the trip you could have swore he was yelling at you from the back.  You pulled off at the exit and went down what you thought was a pretty isolated road.  And you dumped him on the side.  You forgot you had left all of his things back at your house + you got paranoid and decided you had to go back.  You dumped his clothes in different dumpsters all over Ferndale + Royal Oak.  The pictures of his wife + kids you burned! threw out bible + little league scrapbook.  Think of something creative to end it with.  Some kind of moniker.  You cut up his ID and throw it away.  But you kept his collectable [sic?] cards, his Marinos + old time baseball players.  You were going to sell them but you were afraid that they could be traced back to you.  You have followed his story throughout the years.  You can't believe you've never been caught or suspected.  You figured Mike had to of told someone about you.  You're not willing to do time but you can't let an innocent woman sit in jail for something that isn't her fault.  You had your mother taken away from you when you were young, you can't do that to other kids, not Mikes [sic?] kids.  You still love him, and you are sorry.  He haunts you and you must clear your soul for you are in the end stages of AIDS (needle use)  Let his family know you are sorry.  Improvise with what else sounds good (or believable).

When you address the letters put on labels under names URGENT RE MIKE SMITH CASE.

I know this is huge honey, but Im [sic?] desperate.  I can't handle it in here.  This hopefully will cast enough reasonable doubt at least to get it thrown out.  And like I said no one will think it was you writing it.  Just don't leave prints or DNA (obviously)

Think of something creative to end it with, some kind of moniker.

And like I said before please dont [sic?] doubt me.  I didn't do it.  I don't know and with what I've read and learned the man who died isn't the one I knew.  I need to be with my boys, what if they actually terminate my rights, can you imagine?  <u>Please</u> help me!

In the one to the Judge + Oakland Press put that you are sending it to her because the Sheriffs [sic?] dept seems so inept.  Sound smart but not too smart, after all you are a recovering junkie.  And <u>please</u> don't hate me or shut me out for asking.  I love you.

Me.

Here soon I will be all alone, help!

It must sound remorseful

Please do ASAP, say your time is running out to come clean.

(TT 11/1/07, 313-322); Appendix I.

Cutean had received at least 14 letters from Petitioner.  (TT 11/2/07, 6).  Cutean had also talked with Petitioner on the telephone.  (TT 11/2/07, 6).

*Petitioner admits she lied during her initial police interviews*

Oakland County Sheriff's Department Deputy Christopher Lanfear conducted special interviews and was a consultant to the special investigations' unit.  (TT 11/2/07, 10).  Lanfear interviewed Petitioner three times.  (TT 11/2/07, 14).  The first time was on December 26, 2002; the second, December 28, 2002; the third, January 9, 2003.  (TT 11/2/07, 15, 22, 24).  The first two times, Petitioner told the same story about dropping Michael off at the bus depot.  (TT 11/2/07, 15-16).  The last time, Petitioner changed her story to say that Michael returned home and she dropped him off the following morning.  (TT 11/2/07, 16).

Lanfear also interviewed Randy Parks on January 21, 2003.  (TT 11/2/07, 23).  Randy Parks denied shooting Michael.  (TT 11/2/07, 31-32).  While Parks had a handgun, it was of a different caliber than the bullets recovered from Michael's body.  (TT 11/2/07, 37).

*Petitioner hires her own investigator*

In March, 2004, Petitioner hired Kenneth Quisenberry, who had worked for the Oakland County Sheriff's Department for 25 years, discussing the possibility that Michael was involved in a homosexual relationship.  (TT 11/1/07, 188-189, 210-211, 213, 215-216, 229, 231-232).  Petitioner did not implicate Randy Parks as a suspect and, in fact, described him as a friend.  (TT 11/1/07, 216-217, 231).  Quisenberry never found anything to confirm or deny Petitioner's theory about a planned or unplanned encounter at the bus station.  (TT 11/1/07, 218-219).  Petitioner told Quisenberry that the blood in the bedroom came from Michael after he bumped his head.  (TT 11/1/07, 220-221).

26

*The police investigation uncovers Petitioner's lies*

Detective-Sergeant Wurtz went to the bus station with other investigators and no one recalled seeing Michael.  (TT 11/2/07, 72).  There were only two buses leaving on Tuesday, December 10, 2002.  (TT 11/2/07, 72).  One bus went north and the other south.  (TT 11/2/07, 72, 76).  The bus going south left at 7:15 p.m.  (TT 11/2/07, 72-73).  There was no record that Michael bought a ticket that night.  (TT 11/2/07, 73).  There was only one-round trip ticket purchased to Ocala, Florida, but not Orlando, where Michael was supposed to be going.  (TT 11/2/07, 73).

Wurtz also checked with the cab companies that serviced the bus station.  (TT 11/2/07, 75).  There were no fares picked up on the evening of the 10th.  (TT 11/2/07, 75).

When Petitioner's information changed to indicate that Michael left on Wednesday morning, there was still no record that he had bought a ticket.  (TT 11/2/07, 73-74).  The police also checked hotels and motels in the area, but found no record of Michael staying there.  (TT 11/2/07, 79-80).

Wurtz talked to Michael's mother, brother and Reverend Chassie.  (TT 11/2/07, 77-78).  Wurtz learned that Michael had told his mother that he was not going to Florida because he was spending Christmas with his boys.  (TT 11/2/07, 79).

Wurtz also had investigators go to the car dealership where Michael worked.  (TT 11/2/07, 68-70).  Wurtz learned that no one there was aware that Michael was leaving.  (TT 11/2/07, 70-71).  In fact, Michael had reportedly discussed his plans for investing his money in the 401(k) program.  (TT 11/2/07, 71).

Wurtz had investigators go to the places Petitioner reported that Michael frequented and they left flyers there.  (TT 11/2/07, 67-68); Appendix J.

27

On December 23, 2002, the police talked with Petitioner again.  (TT 11/2/07, 82-83).

Petitioner described Michael negatively, indicating that they were headed for divorce.  (TT

11/2/07, 87).  Petitioner reiterated that she had dropped Michael off at the bus station so that he

could go to rehabilitation in Florida.  (TT 11/2/07, 88).

Petitioner denied that Michael had been physically abusive.  (TT 11/2/07, 91).  Petitioner

described Michael as a great guy when he wasn't drinking.  (TT 11/2/07, 92).  Petitioner had no

thoughts on who would kill Michael, but noted that he had been in two bar fights because of his

opinionated nature when drinking.  (TT 11/2/07, 97-98).

Petitioner reported that it was not unusual for Michael not to call her; however,

Petitioner's co-workers and Michael's co-workers claimed that the couple called each other

frequently.  (TT 11/2/07, 101, 196-197).

Petitioner reported learning of her family's eviction on Sunday December 8, 2002,

claiming that it precipitated the argument that led to Michael's decision to leave for Florida.  (TT

11/2/07, 104-106).

Thereafter, the police checked Michael's telephone records.  (TT 11/2/07, 109-10).  The

police also checked the couple's financial records.  (TT 11/2/07, 109).

On December 26, 2002, Petitioner came to the police station.  (TT 11/2/07, 110).  The

police had canvassed the area surrounding the bus station and there was no indication that

Michael had been there.  (TT 11/2/07, 111).  The police pressed Petitioner on the issue of her

having an affair with Randy Parks.  (TT 11/2/07, 112-113).  Petitioner, however, denied any

affair, even though she claimed that Parks had a crush on her.  (TT 11/2/07, 113).  Parks had paid

Petitioner's utilities when they were in danger of being cut off.  (TT 11/2/07, 113).  Parks was

aware of the problems in Petitioner's marital relationship.  (TT 11/2/07, 113).

28

According to Petitioner, Michael's bus ticket cost $115 and he took money to buy some snacks for the 20-hour bus ride. (TT 11/2/07, 115). That was the last of the money they had. (TT 11/2/07, 116).

As for Michael's commission check, Petitioner claimed that it had been eaten up by the advances Michael had taken. (TT 11/2/07, 116). Wurtz discovered that Michael's bonus check was smaller than expected because of advances Michael had taken. (TT 11/2/07, 286-287).

According to Petitioner, she did not want Michael to know where she was living if he came back from Florida. (TT 11/2/07, 118-119).

Petitioner maintained that she returned home after dropping Michael at the bus station. (TT 11/2/07, 119). Petitioner took diapers to her grandparents' house. (TT 11/2/07, 119). Petitioner and her sister returned to Petitioner's house. (TT 11/2/07, 119). Petitioner had her sister wait outside to tell Parks that she was not going to be using his truck to move as planned because she felt a migraine coming on. (TT 11/2/07, 120-121).

Petitioner agreed that she returned Michael's work uniforms the following Thursday after he left. (TT 11/2/07, 122).

Petitioner admitted that she told Parks that she wanted to borrow a gun to kill Michael earlier in the summer. (TT 11/2/07, 125-126, 129-130).

Just days before Michael left, Petitioner had a conversation with Parks and described how Michael had gotten them evicted. (TT 11/2/07, 128). Parks called Michael "a bastard." (TT 11/2/07, 128-129). Petitioner told Parks that she wished Petitioner would just die and go away. (TT 11/2/07, 129-130).

The police learned from phone records that Michael called Petitioner at her grandparents' house at 8:30 p.m. on Tuesday, December 10, 2002. (TT 11/2/07, 132-133, 140). Petitioner's

grandmother told Michael that Petitioner was leaving with her sister Rachel and going home. (TT 11/2/07, 134). Michael stated that he would catch up with her there. (TT 11/2/07, 134-135). Michael was calling from the marital home. (TT 11/2/07, 145).

On January 9, 2003, the police confronted Petitioner with the phone records after she maintained that Michael called her from an Ohio rest stop for the bus at 8:30 p.m. (TT 11/2/07, 137, 145, 156). Petitioner had told her grandmother that story after her grandmother had asked her if Michael had contacted her. (TT 11/2/07, 144). Wurtz knew that the bus was not scheduled to stop until 2:30 a.m. (TT 11/2/07, 138). Petitioner continued to deny that there was a telephone call. (TT 11/2/07, 145-146). Petitioner continued to deny that Michael returned home. (TT 11/2/07, 156-158).

After an hour, Petitioner finally admitted that Michael returned. (TT 11/2/07, 160). Petitioner claimed that she was concerned about disappointing her grandparents because her grandfather had rented the apartment with the stipulation that Michael never enter it. (TT 11/2/07, 159-160).

Petitioner then claimed that she entered the house and saw Michael's bags and Michael. (TT 11/2/07, 160). At that point, she told her sister Rachel to go outside and send Parks away. (TT 11/2/07, 160). Petitioner and Michael talked. (TT 11/2/07, 161). Petitioner slept on the couch while Michael slept in the bed. (TT 11/2/07, 161-162). Petitioner told the police that Michael, who slept in the nude or in his underwear, urinated in the bed when he drank too much. (TT 11/2/07, 162, 166). Petitioner hadn't slept in the bed in months. (TT 11/2/07, 162).

Michael's life insurance file was admitted. (TT 11/2/07, 139-140). Petitioner had told the police that she had called solely to inquire about burial benefits. (TT 11/2/07, 181-182, 197). In fact, Petitioner made sure that the policy was still in effect on October 31, 2002, and, on

30

December 20, she made a claim.  (TT 11/2/07, 178, 180-182, 197; TT 11/5/07, 48-50).  Given that Petitioner was fully aware that Michael was shot, Wurtz thought it significant that Petitioner listed Michael's cause of death as "unknown."  (TT 11/2/07, 182; TT 11/5/07, 49).

In February 2003, Wurtz learned that Michael's DNA was in the blood on the floorboards from the bedroom closet.  (TT 11/2/07, 182-183).  Despite strong indications Petitioner had killed Michael, Wurtz continued to investigate.  (TT 11/2/07, 183-184).

The police used investigative subpoenas to gather information from Petitioner, her sister Rachel, her grandfather, her grandmother, her mother and her father.  (TT 11/2/07, 186-187).  Wurtz discovered inconsistencies in Petitioner's investigative subpoena testimony and the evidence uncovered by the police, believing that parts of it did not make sense.  (TT 11/2/07, 188-189).  First, although Petitioner maintained that she had had discussions with an attorney about a divorce, her telephone records revealed only two calls lasting fifteen seconds and less than one minute.  (TT 11/2/07, 190-191).  Second, it made no sense for Petitioner to take the boys to her grandparents' house to spend the night if that was going to be Michael's last time with them.  (TT 11/2/07, 192).  Third, it made no sense for Michael to attend a 401(k) meeting if he was leaving his job.  (TT 11/2/07, 192).  Fourth, if Michael knew he was leaving his job, why wouldn't he have turned in his uniforms?  (TT 11/2/07, 192).  Michael had not told anyone he worked with that he was quitting and Wurtz thought that was strange as well.  (TT 11/2/07, 192).

Furthermore, while Petitioner maintained that her grandfather had called the Greyhound station in the afternoon and that she had called Michael at work to advise him that buses left at 3 p.m. and 7:15 p.m., the telephone records indicated that Petitioner's grandfather had called the station in the morning and Petitioner had called Michael at 3:39 p.m., after the 3 p.m. bus left. (TT 11/2/07, 193-194).

31

Wurtz also thought that it did not make any sense for Petitioner to pick Michael up from work without bringing the bags he had allegedly packed rather than having to drive back to the house to pick them up.  (TT 11/2/07, 194-195).  And, while Petitioner claimed to have gone from the bus station to her grandmother's house, other information indicated that Petitioner had picked up her sister.  (TT 11/2/07, 195).

Petitioner also claimed that she had tried to call Michael's mother and sister before calling the insurance company.  (TT 11/2/07, 199).  Petitioner claimed that she kept getting answering machines; however, no calls to Florida were made before 7 p.m. that day.  (TT 11/2/07, 199-200).

As for Petitioner's claim that she did not know that she was being evicted, Moore specifically recalled telling Petitioner that she would be evicted on Thanksgiving weekend.  (TT 11/2/07, 200).

Petitioner admitted lying to the police, stating that she had done so because of her pride when she had previously said she was afraid of her grandfather's reaction.  (TT 11/2/07, 197-198, 202).

Over the years, Detectives Wurtz and Miller continued to work on solving Michael's murder.  (TT 11/2/07, 202-211, 214-218).

In 2007, Petitioner's on-and-off boyfriend called Wurtz to inform him that he was cleaning out his basement and found two military-type duffel bags hidden underneath the stairs.  (TT 11/2/07, 211-212).  The bags were admitted; however, Wurtz agreed that they did not match the description Petitioner provided to the police, even though they had designations indicating that they belonged to Michael.  (TT 11/2/07, 213-214, 292-293; TT 11/5/07, 11-12, 74).  The smaller bag contained men's and children's clothing and possibly women's clothing.  (TT

32

11/5/07, 74).  The larger bag contained Michael's military clothing, blue work or military shirts and socks.  (TT 11/5/07, 74).  Petitioner had originally told the police that Michael had taken her sea bag and Wurtz wondered why Michael would not take his own; however, in her deposition, she mentioned Michael's sea bag.  (TT 11/5/07, 50-51).

Petitioner's sister's father-in-law had a .38-caliber handgun which was consistent with the caliber that Michael was shot with and those tests proved inconclusive.  (TT 11/2/07, 216-218, 260, 285-286; TT 11/5/07, 72-73).  Petitioner's sister's father-in-law denied giving Petitioner his unregistered gun.  (TT 11/5/07, 8, 72).

Audiotapes of three telephone conversations Petitioner had while in jail were also admitted.  (TT 11/2/07, 221-223).  They are being submitted in the traditional manner as Appendix K.  In the first telephone call, Petitioner speaks with her sister Rachel asking if she found "that stuff yet" and telling her that she came up with another idea and would be sending a letter.  Appendix K.  In the second call, Petitioner asks Rachel if she received Petitioner's letter and, when Rachel tells her that she did, Petitioner asks:  "Are you gonna take care of that?"  Appendix K.  Rachel expresses hesitation and Petitioner encourages her to do it, telling her that it must be done in the next couple of days because she goes to court on Tuesday.  Appendix K.  Thereafter, Petitioner repeatedly tells Rachel that she has to do it and tells her to "buy everything new".  Appendix K.  In the third call, Petitioner leaves a message for Rachel, indicating that her father had told her that she didn't think that she could do it.  Appendix K.  Petitioner states:  "I didn't know if that meant at all or just until your knee was better or what?  So ah call Mom and let her know . . . ."  Appendix K.  Petitioner marks her message urgent.  Appendix K.

A copy of one of the letters Petitioner wrote to her sister Rachel from jail was intercepted and admitted.  (TT 11/2/07, 225-227); Appendix L.

Petitioner's letter to Kelly Cutean was intercepted and she brought it to court after she was served with an investigative subpoena. (TT 11/2/07, 227-228). Petitioner wrote a follow-up letter. (TT 11/5/07, 44-47); Appendix M.

Rachel did not bring the original letter Petitioner had sent her despite being served with an investigative subpoena. (TT 11/2/07, 229). Rachel admitted destroying that letter. (TT 11/5/07, 9-10).

The police obtained a search warrant for Petitioner's parents' house, where they found totes with Michael's possessions, including a Detroit Tigers' baseball cap and a Bible embossed with Michael's name. (TT 11/2/07, 233-238; TT 11/5/07, 4). Petitioner had told the police that Michael had packed his Bible. (TT 11/5/07, 72).

Before interviewing Parks, the police talked to a relative of Lanfear's who worked with Parks and hunted with him. (TT 11/2/07, 263; TT 11/5/07, 25-27). The police treated Parks as a suspect based on information provided by Petitioner and, later, Petitioner's sister Rachel. (TT 11/2/07, 247-250, 257, 290; TT 11/5/07, 24-25, 35-36, 59-60).

The police met with Parks' employer before interviewing Parks. (TT 11/2/07, 263; TT 11/5/07, 31-32). Parks' employer provided information that Parks was working and had not been late for work or absent from work during the time-frame the police were given. (TT 11/5/07, 32). On Wednesday, December 11, 2002, Parks was working. (TT 11/2/07, 167-168).

Parks told Wurtz that he and Petitioner were friends, stating that if he was younger and "lighter" and if he wasn't engaged to his ex-wife, he might be interested in Petitioner. (TT 11/2/07, 250-252; TT 11/5/07, 13, 33-34). Parks admitted he hunted in the thumb area of Michigan and in Grayling, even though he admitted killing a doe in Fenton, within driving distance of where Michael's body was found. (TT 11/2/07, 253, 267-268; TT 11/5/07, 27, 55-

34

56).  Detective-Sergeant Wurtz explained that by going north on I-75 and exiting on the East Holly Road exit would lead to Oak Hill Road, where Michael's partially nude body was found. (TT 11/2/07, 103-104).

Parks had long guns and two firearms, but neither could fire the ammunition used to kill Michael.  (TT 11/2/07, 253, 258-259, 268-269; TT 11/5/07, 26-27, 30-31).  Parks denied giving Petitioner a gun.  (TT 11/5/07, 8).  Wurtz even checked to see if Parks' father might have a weapon, but none was registered to him.  (TT 11/5/07, 31).

When Parks arrived on the evening of December 10, 2002, he was sent away by Petitioner's sister, who told him that Petitioner had a migraine.  (TT 11/2/07, 260; TT 11/5/07, 20-21).  Parks helped Petitioner move the following day.  (TT 11/2/07, 260).

Parks, who also processed deer, told the police that he had thrown away bloody deer parts in a dumpster near Petitioner's house on December 11, 2002, having forgotten to do so at his work dumpster.  (TT 11/2/07, 262, 269; TT 11/5/07, 27-28, 63-64).  The police tried to find the bags, but the dumpster had been emptied and ultimately taken to Warren for removal to a land fill or to be incinerated.  (TT 11/5/07, 29).  In any event, Wurtz did not believe that bags of bloody deer parts had anything to do with Michael's murder because Michael's body was not dismembered.  (TT 11/5/07, 28).

The police obtained Parks' telephone records which confirmed that he and Petitioner spoke.  (TT 11/5/07, 30).  Parks' criminal history and driving record were clean.  (TT 11/5/07, 30).  After their investigation, the police did not consider Parks a suspect.  (TT 11/2/07, 290).

Petitioner's attorney asked the police not to talk to her after January 9, 2003, and, outside of the investigative subpoena, they did not.  (TT 11/5/07, 39-40).  Petitioner's investigative subpoena testimony was admitted.  (TT 11/5/07, 44).  Appendix N.

35

After hearing the evidence, the jury acquitted Petitioner of first-degree murder, but convicted her of second-degree murder.  (TT 11/6/07, 3-5).

B.    Procedural History

Following her conviction and sentence, Petitioner filed a claim of appeal in the Michigan Court of Appeals, which raised the following claims:

I.    THE COURT ABUSED ITS DISCRETION AND DENIED
      DEFENDANT A FAIR TRIAL WHEN IT PERMITTED THE
      PROSECUTION TO PRESENT AN EXPERT WITNESS TO TESTIFY
      THAT DEFENDANT LIED AND WAS NOT TRUSTWORTHY.

II.   THE PROSECUTOR ENGAGED IN MISDCONDUCT AND DENIED
      DEFENDANT A FAIR TRIAL WHEN HE BOLSTERED THE
      TESTIMONY OF THE INVESTIGATING OFFICER BY ELICITING
      TESTIMONY FROM ANOTHER WITNESS THAT THE OFFICER
      WAS QUALIFIED AND COMPETENT AND NEVER KNOWN TO DO
      "AN IMPROPER FOLLOWING OF A CASE OR LEADS."

III.  THE COURT ABUSED ITS DISCRETION WHEN, OVER DEFENSE
      OBJECTION, IT ADMITTED EVIDENCE OF HIGHLY PREJUDICIAL
      BUT MINIMALLY PROBATIVE LETTERS WRITTEN BY
      DEFENDANT WHILE SHE WAS IN THE COUNTY JAIL.

IV.   THIS CASE SHOULD BE REMANDED FOR RESENTENCING
      BECAUSE THE TRIAL COURT DEPARTED FROM THE
      RECOMMENDATION OF THE SENTENCING GUIDELINES FOR
      TWO REASONS, NEITHER OF WHICH WAS OBJECTIVE AND
      VERIFIABLE, AND BECAUSE THE EXTENT OF THE DEPARTURE
      WAS EXTREME, PARTICULARLY WHERE A MISSCORING OF
      ONE OF THE OFFENSE VARIABLES INFLATED THE
      RECOMMENDED SENTENCING RANGE.

The Court of Appeals affirmed Petitioner's conviction in an unpublished opinion, but remanded for resentencing.  (*People v. Smith,* Mich. Ct. App. No. 282546 (August 6, 2009)).

Having prevailed on her fourth claim, Petitioner filed an application for leave to appeal with the Michigan Supreme Court raising her first three claims.  That Court denied Petitioner's application in a standard order.  (*People v. Smith,* Mich. Sup. Ct. No. 139727 (December 21, 2009); *People v. Smith,* 485 Mich. 1011, 775 N.W.2d 776 (2009)).

36

On February 2, 2010, the state trial court resentenced Petitioner to 25 to 60 years' imprisonment.  (T 2/2/10, 13).  Petitioner appealed on April 15, 2010, but moved to withdraw her appeal.  The Michigan Court of Appeals dismissed Petitioner's appeal on September 7, 2010.  (*People v. Smith,* Mich. Ct. App. No. 297539 (September 7, 2010)).  Petitioner did not appeal to the Michigan Supreme Court.  See Affidavit of Corbin R. Davis dated June 3, 2011.

Petitioner filed the instant habeas petition on January 27, 2011.

**Statement Regarding Applicable Bars to Review**

In conformance with Rule 5, Respondent states as follows with respect to whether any of Petitioner's claims are barred from habeas review.[4]

A.    Statute of Limitations

28 U.S.C. § 2244(d) provides for a one-year statute of limitations after finalization of direct review with a properly filed collateral review tolling the limitations period.

Petitioner's petition is timely.  See Procedural History, *supra*.

B.    Exhaustion of State Court Remedies

A habeas petitioner is required to fairly present all of her habeas claims to the State courts before presenting them in federal court in a habeas action.  28 U.S.C. § 2254(b)(1) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that
> > (A) the applicant has exhausted the remedies available in the courts of the State; or
> >
> > (B)(i) there is an absence of available State corrective process; or (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

The purpose of the exhaustion rule is to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal court, and to "protect the state courts' role in the enforcement of federal law."  *Rose v. Lundy*, 455 U.S. 509, 518 (1982).  The exhaustion doctrine is more than a "procedural hurdle," and "[e]xhaustion

---

[4] Rule 5 of the Rules Governing Section 2254 Cases in the United States District Court states as follows:

Rule 5.  The Answer and the Reply

(b)    Contents: addressing the allegations; stating a bar. The answer must address the allegations in the petition. In addition, it must state whether any claim in the petition is barred by a failure to exhaust state remedies, a procedural bar, non-retroactivity, or a statute of limitations.

means more than notice." *Keeney v. Tamayo-Reyes,* 504 U.S. 1, 9 (1982).  To exhaust, a petitioner "must have fairly presented the substance of his claim to the state courts."  This means the claim *and* its supporting factual allegations.  "It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made." *Anderson v. Harless,* 459 U.S. 4, 6 (1982).  The petitioner bears the burden of proving that she has either exhausted his state remedies prior to filing her federal petition, or that she satisfies an exception to the exhaustion requirement. *Darr v. Burford*, 339 U.S. 200, 218-19 (1950).

"[O]rdinarily, a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." *Baldwin v. Reese,* 541 U.S. 27, 32 (2004).  To exhaust a federal habeas claim, a petitioner must properly raise it in each appropriate state court, including the state intermediate court of appeal in addition to the state's highest court. *Reese*, 541 U.S. at 29.

In order to fairly present a federal claim, the inmate must raise the claim in a procedurally correct manner that allows for a merits review in state court, including the state's highest court. *Castille v. Peoples,* 489 U.S. 346, 351 (1989).  A claim is exhausted, notwithstanding the failure to present the claim in the proper manner, if the state's highest court nevertheless addresses the claim on the merits. *Peoples*, 489 U.S. at 351.  Denial of an application for an extraordinary writ by a state appellate court does not serve to exhaust state remedies where the denial cannot be fairly taken as an adjudication of the merits of claims presented, and where normal channels for review are available. *Pitchess v. Davis*, 421 U.S. 482, 488 (1975) (per curiam).

It does not matter that a petitioner has no right to discretionary review on direct appeal or collateral review. The fact that he has the right to *raise* the claim through a discretionary review in the state supreme court is sufficient to require presentation of the claim to that court to exhaust. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845-47 (1999).

Here, Petitioner did not exhaust Claims I and II when she simply argued that she was denied a fair trial, citing generally to the U.S. Const. Ams. V and XIV. (Brief On Appeal, pp. i-ii, iv, 8, 12). See *Wagner v. Smith,* 581 F.3d 410, 415-16 (6th Cir. 2009).

A federal court cannot entertain a mixed petition – a petition that includes both exhausted and unexhausted claims – for habeas review. The petitioner must either amend the petition to delete the unexhausted claims, or accept dismissal without prejudice to pursuing the unexhausted claims in state court. *Rose v. Lundy*, 455 U.S. 509, 510 (1982). The district court faced with a mixed petition must give the petitioner the choice of exhausting the unexhausted claims by returning to state court, or abandoning the claims and pursuing the remaining claims in federal court. *Jefferson v. Budge*, 419 F.3d 1013, 1016 (9th Cir. 2005). But the Supreme Court has rejected the requirement that a district court give other advisements before dismissing a mixed petition, such as warnings about second- or successive-petition problems, or the statute of limitations. *Pliler v. Ford*, 542 U.S. 225, 231-32 (2004).

The Supreme Court has determined that a district court faced with a mixed petition has discretion to enter a stay to allow the petitioner to present her unexhausted claims to the state court in the first instance, preserving the petitioner's ability to return to federal court for review of his perfected petition. *Rhines v. Weber*, 544 U.S. 269, 275-77 (2005). Because granting a stay effectively excuses a petitioner's failure to present her claims first to the state courts, stay and abeyance is only appropriate when the district court determines there is *good cause* for the

petitioner's failure. *Rhines*, 544 U.S. at 277. Moreover, even if the petitioner has good cause for the failure to exhaust earlier, the district court should not grant a stay if the unexhausted claims are plainly meritless. *Rhines*, 544 U.S. at 277. Finally, if a petitioner engages in abusive litigation tactics or intentional delay, the district court should not grant a stay. *Rhines*, 544 U.S. at 277. Even where stay and abeyance is appropriate, the district court's discretion in structuring the stay is limited by the timeliness concerns in AEDPA. Thus, district courts should place reasonable time limits on a petitioner's trip to state court and back. *Rhines*, 544 U.S. at 278. If a stay and abeyance is not appropriate, the district court should allow the petitioner to delete the unexhausted claims and to proceed with the exhausted claims if dismissal of the entire petition would unreasonably impair the petitioner's right to obtain federal relief. *Rhines*, 544 U.S. at 278.

The federal court is authorized to deny relief on the merits of an unexhausted claim. 28 U.S.C. § 2254(b)(2). But it cannot *grant* relief if the claim is unexhausted. *Aparicio v. Artuz*, 269 F.3d 78, 91 n.5 (2d Cir. 2001); *Mercadel v. Cain*, 179 F.3d 271, 276 (5th Cir. 1999).

Here, Petitioner's first two claims are procedurally defaulted and meritless. This Court should not grant a stay, but, instead, should deny and dismiss Petitioner's habeas petition.

C.    <u>Procedural default</u>

To the extent a petitioner deprives the state court of the opportunity to review her claims by failing to follow reasonable State court procedures, review of the claims is procedurally defaulted. "[P]rocedural default results where three elements are satisfied: (1) the petitioner failed to comply with a state procedural rule that is applicable to the petitioner's claim; (2) the state courts actually enforced the procedural rule in the petitioner's case; and (3) the procedural forfeiture is an 'adequate and independent' state ground foreclosing review of a federal constitutional claim." *Willis v. Smith*, 351 F.3d 741, 744 (6th Cir. 2003) (quoting *Maupin v.*

41

*Smith*, 785 F.2d 135, 138 (6th Cir. 1986)).  In this case, first two claims are procedurally defaulted.

Petitioner argues that she is entitled to habeas relief because a police officer testified she lied to him and, therefore, he believed she was untrustworthy, and because her own investigator, who had previously worked for the same sheriff's department, testified that the police investigators were generally competent, even though he did not know how they performed in this case.  Petitioner is not entitled to habeas relief because review of her claims is barred given her failure to contemporaneously object.  Petitioner failed to comply with a state procedural rule that requires defendants in criminal cases to present their claims to the trial court before raising them on appeal.  See *People v. Carines*, 460 Mich. 750, 761-64 (1999) (unpreserved constitutional error); *People v. Grant*, 445 Mich. 535, 546 (1994) (unpreserved non-constitutional error).  The last state court to issue a reasoned opinion on her claim was the Michigan Court of Appeals, which denied relief because Petitioner failed to preserve her claims in the trial court.  (*People v. Smith,* Mich. Ct. App. No. 282546 (August 6, 2009), slip op. at 1-2).  When the Court of Appeals addressed these issues, it found that its review was limited to whether "plain error" occurred. (*Id.*)  This decisional ground constitutes a procedural default.  *Gulertekin v. Tinnelman-Cooper*, 340 F.3d 415, 423-424 (6th Cir. 2003).  The contemporaneous-objection rule is an adequate and independent state ground for the state court's decision because it was "firmly established and regularly followed" before Petitioner's trial.  *Rogers v. Howes*, 144 F.3d 990, 992 (6th Cir.1998) (quoting *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991)).

Because the elements of procedural default have been satisfied, Petitioner must show "cause" for failing to follow state procedure and "actual prejudice" as a result of the alleged violation of federal law.  *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  Alternatively,

Petitioner must demonstrate that a fundamental miscarriage of justice will occur if this Court fails to consider the substantive merits of her claims. *Coleman,* 501 U.S. at 750.

Petitioner does not allege that her trial attorney was ineffective for failing to preserve these claims in the trial court. In any event, only constitutionally ineffective assistance of counsel is "cause" for a procedural default; stated otherwise, "[a]ttorney error short of ineffective assistance of counsel . . . does not constitute cause and will not excuse a procedural default." *McCleskey v. Zant*, 499 U.S. 467, 494 (1991) (citing *Murray v. Carrier*, 477 U.S. 478, 486-88 (1986)).

To prove that her attorney was constitutionally ineffective, Petitioner must show that her attorney's performance was deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The failure to raise meritless issues is not ineffective. *Mapes v. Coyle,* 171 F.3d 408, 413 (6th Cir. 1999), *cert. den. sub. nom. Coyle v. Mapes,* 528 U.S. 946; 120 S. Ct. 369; 145 L. Ed. 2d 284 (1999). Likewise, counsel may choose not to object as a matter of trial strategy. *Lundgren v. Mitchell,* 440 F.3d 754, 774-775 (6th Cir. 2006). Because Petitioner has failed to demonstrate that the evidence admitted was objectionable or that her retained trial counsel did not object as a matter of trial strategy, ineffective assistance cannot be deemed "cause" for Petitioner's procedural default.

This Court need not determine whether Petitioner has demonstrated the requisite prejudice, because she has failed to show "cause" for her procedural default. *Willis*, 351 F.3d at 746 (citing *Simpson v. Jones*, 238 F.3d 399, 408 (6th Cir. 2000)). And, even if she had, the circumstantial evidence presented at trial established Petitioner's guilt and she cannot show she was prejudiced by the admission of the testimony to which she now objects.

The narrow exception for fundamental miscarriages of justice is reserved for the extraordinary case in which the alleged constitutional error probably resulted in the conviction of one who is actually innocent of the underlying offense. *Dretke v. Haley*, 541 U.S. 386, 388 (2004); *Carrier*, 477 U.S. at 496. A claim of actual innocence "requires [the] petitioner to support her allegations of constitutional error with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). Petitioner has not presented any new evidence in support of a claim of actual innocence. Therefore, no miscarriage of justice will occur from this Court's failure to consider the substantive merits of Petitioner's claims. Petitioner's first two claims are procedurally defaulted.

      D.    <u>Non-retroactivity doctrine</u>

Petitioner may not rely on rules of law that were recognized after her conviction became final. Even in the absence of § 2254(d)'s deference standard, the Supreme Court has made clear that federal courts may not grant state prisoners relief in collateral proceedings if to do so would create new rules of constitutional law which were not controlling at the time of the state court decision. This is so because the purpose of federal collateral review is to uphold final state court judgments which were valid when entered, not as a "mechanism for the continuing reexamination of final judgments." *Sawyer v. Smith*, 497 U.S. 227, 234 (1990). Thus, the federal courts are required to "validate [] reasonable, good-faith interpretations of existing precedents made by state courts." *Saffle v. Parks*, 494 U.S. 484, 488 (1990).

The Supreme Court, moreover, has made clear that the "new rule" doctrine survives the 1996 amendments to § 2254. *Schriro v. Summerlin*, 542 U.S. 348 (2004) (holding that *Ring v. Arizona*, 536 U.S. 584 (2002), was new rule); *Banks v. Horn*, 536 U.S. 266, 272 (2002) ("in addition to performing any analysis required by AEDPA, a federal court considering a habeas

44

petition must conduct a threshold [new rule] analysis when the issue is properly raised by the state"); *Breard v. Greene*, 523 U.S. 371, 377 (1998) (per curiam) (argument that "Vienna Convention" claim too novel to be barred by § 2254(e)(2) is barred by new rule doctrine).

      E.      Evidentiary Hearings and Discovery

Petitioner has not demonstrated entitlement to a federal evidentiary hearing because the petition may be denied based on the existing record. See 28 U.S.C. § 2254(e)(2). In *Schriro v. Landrigan*, the United States Supreme Court held that "[b]ecause the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate." *Landrigan,* 550 U.S. at 474. The Court held that "[i]t follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Id.* at 474.

Respondent also contends that Petitioner has not demonstrated entitlement to any discovery. For good cause shown, this Court has the discretion to permit discovery in a habeas proceeding, (Rule 6(a) of the Rules Governing Section 2254 Cases in the United States District Court), "provided that the habeas petitioner presents specific allegations showing reason to believe that the facts, if fully developed, may lead the district court to believe that federal habeas relief is appropriate." *Lott v. Coyle*, 261 F.3d 594, 602 (6th Cir. 2001). "Conclusory allegations are not enough to warrant discovery under [Habeas Corpus Rule 6]; the petitioner must set forth specific allegations of fact." *Williams v. Bagley,* 380 F.3d 932, 974 (6th Cir. 2004) (internal quotation marks and citations omitted). In this case, Petitioner has not met this burden.

**Standard of Review**

Congress mandated the standards of review in federal habeas proceedings in 1996 in the

Antiterrorism and Effective Death Penalty Act, the AEDPA. Under 28 U.S.C. §2254(e)(1), a

determination of a factual issue made by the state courts shall be presumed correct and may be

rebutted only by clear and convincing evidence.  *Landrigan*, 550 U.S. at 473-474.  Facts found

by a State appellate court enjoy the same presumption.  See *Sumner v. Mata*, 449 U.S. 539, 541-

549 (1981).

For claims decided on the merits by the State court, relief may not be granted to

Petitioner under § 2254(d) unless the state court's decision was contrary to, or involved an

unreasonable application of, clearly established law as determined by the Supreme Court of the

United States, or unless the state court's decision was based on an unreasonable determination of

the facts in light of the evidence presented in the state court proceeding.  "The question under

AEDPA is not whether a federal court believes the state court's determination was incorrect but

whether that determination was unreasonable - a substantially higher threshold."  *Landrigan*, 550

U.S. at 473.  Under this controlling standard, a federal court is not free to second-guess the

judgment of the State court regarding the merits of any constitutional claim, unless "the state

court arrives at a conclusion opposite to that reached by [the United States Supreme] Court on a

question of law or if the state court decides a case differently than [the United States Supreme]

Court has on a set of materially indistinguishable facts."  *Williams v. Taylor*, 529 U.S. 362, 413

(2000).

In *Bell v. Cone*, 535 U.S. 685 (2002), the Supreme Court made clear that the federal

courts may not conduct a de novo review of claims rejected on their merits by the state court:  "a

federal habeas court may not issue a writ … 'simply because a federal habeas court concludes in

its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly.'" *Bell v. Cone*, 535 U.S. at 694, quoting *Williams*, 529 U.S. at 411; see also *Bell*, 535 U.S. at 698-99 (the prisoner "must do more than show that he would have satisfied *Strickland's* test if his claim were being analyzed in the first instance, because under §2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied Strickland incorrectly."); accord *Holland v. Jackson*, 542 U.S. 649, 653 (2004); *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003); *Price v. Vincent*, 538 U.S. 634, 639-40 (2003); *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003).

Indeed, even when the state court decision in fact is incorrect, it is not grounds for relief in a federal habeas court unless it also was unreasonable. *Brown v. Payton*, 544 U.S. 133, 141 (2005). See also *Mitchell v. Esparza*, 540 U.S. 12, 16-18 (2004) (not unreasonable for state court to find harmless the failure to charge an element of the crime in the indictment); *Early v. Packer*, 537 U.S. 3, 8 (2002) (state court decision may be reasonable even if state court did not know Supreme Court governing law); *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002) (benefit of doubt must be given to reasonableness of state court decision). Furthermore, the Supreme Court has taken a narrow view on what constitutes "clearly established law." In *Carey v. Musladin*, the Supreme Court reversed a grant of habeas corpus relief because the issue in question – whether the defendant's right to a fair trial was violated when the victim's family sat in the courtroom wearing buttons with the victim's photograph – had never been addressed by the Supreme Court. Similarly, in *Wright v. Van Patten*, the Supreme Court reversed a grant of habeas corpus relieve because there was no Supreme Court precedent establishing that counsel's appearance by telephone amounted to a complete denial of defendant's right to counsel. *Carey v. Musladin*, 549 U.S. 70, 76 (2006); *Wright v. Van Patten*, 128 S.Ct. 743, 747 (2008).

The Court has also consistently drawn a distinction between State court decisions applying a broad constitutional standard and ones that apply a narrow rule.  As explained in *Yarborough*, where a standard is at issue, State court decisions are given greater leeway:

> [i]f a legal rule is specific, the range may be narrow. Applications of the rule may be plainly correct or incorrect. Other rules are more general, and their meaning must emerge in application over the course of time. Applying a general standard to a specific case can demand a substantial element of judgment. As a result, evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case by case determinations.  [*Yarborough v Alvarado*, 541 U.S. 652, 664 (2004).]

In *Knowles v. Mirzayance*, 556 U. S. ____ (2009), the Court held that ineffective-assistance-of-counsel claims must be given extra latitude in light of the general nature of the rule: "because the *Strickland* standard is a general standard, a State court has even more latitude to reasonably determine that a defendant has not satisfied that standard."

48

**Argument**

As discussed above, Claims I and II are unexhausted.  Even if they had been exhausted, they are procedurally defaulted.  Moreover, Claim III raises a state law evidentiary issue, which is not cognizable.  Finally, even if Petitioner's claims were properly before this Court, they are meritless.

**I.    This claim is unexhausted and procedurally defaulted.**

Petitioner claims that she was denied a fair trial when a police officer testified that she lied to him and, therefore, was "not trustworthy for [him]."  (TT 11/2/07, 17-18).  Petitioner adds that that same witness testified that in light of Petitioner's conflicting stories as to when she had last seen Michael, her husband and the murder victim, neither story was trustworthy, "[a]nd the person[] that gives you the story is not trustworthy anymore either."  (TT 11/2/07, 19).

Petitioner's claim is unexhausted.  Exhaustion of State Court Remedies, *supra.*  And, even if it was not, it is procedurally defaulted.  Procedural Default, *supra.*

In any event, alleged trial court errors in the application of state evidentiary law are generally not cognizable as grounds for federal habeas relief.  See *Estelle v. McGuire,* 502 U.S. 62, 67-68; 112 S. Ct. 475; 116 L. Ed. 2d 385 (1991); *Serra v. Michigan Dep't. of Corrections,* 4 F.3d 1348, 1354 (6th Cir. 1993).  Only where an evidentiary ruling is "so egregious that it results in a denial of fundamental fairness," may it violate due process and warrant habeas relief.  *Bugh v. Mitchell,* 329 F.3d 496, 512 (6th Cir. 2003).  For example, the United States Supreme Court has held that due process was violated by evidentiary rules preventing a defendant from impeaching his own witness, who had confessed to the crime and then recanted, combined with a rule excluding as hearsay that same witness' confessions to three other people when the circumstances surrounding those confessions revealed them to be reliable.  *Chambers v. Mississippi,* 410 U.S. 284, 296-298, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973).

49

Here, the Michigan Court of Appeals rejected Petitioner's claim, holding:

### I. Officer's Expert Testimony

Defendant's first argument on appeal is that one of the investigating officers in this case improperly testified at trial regarding defendant's credibility. We disagree.

### A. Standard of Review

Defendant did not preserve this issue for appellate review because she failed to raise the issue and have it addressed by the trial court. *People v Pipes*, 475 Mich 267, 277; 715 NW2d 290 (2006). An unpreserved issue is reviewed for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). The error must result in the conviction of an actually innocent defendant or seriously affect the fairness, integrity or public reputation of judicial proceedings to require reversal. *People v Unger*, 278 Mich App 210, 235; 749 NW2d 272 (2008). Reversal is only warranted if curative instructions would not have eliminated prejudice to defendant. *People v Hall*, 396 Mich 650, 655; 242 NW2d 377 (1976); *Unger, supra* at 235.

### B. Analysis

Oakland County Sheriff's Deputy Christopher Lanfear was qualified as an expert witness in interviewing and interrogating. [Unbeknownst to Petitioner's jury, Lanfear is a polygraph operator.] He participated in the police interrogation of defendant. He testified that during the multiple interrogations, it became clear that defendant was lying about the last time that she saw the victim in this case, her husband. When pressed, defendant admitted that she had lied and offered the explanation that she was merely continuing a lie that she had made to her grandparents to avoid their disapproval. Lanfear testified that, irrespective of defendant's explanation, defendant had lied to him and he did not find her trustworthy.

Defendant argues that this constitutes improper opinion testimony regarding the credibility of another witness. Though Lanfear was qualified as an expert, this testimony was the product of his personal observation and did not bring to bear any specialized knowledge or methods.[1] MRE 702; *People v Yost*, 278 Mich App 341, 392; 749 NW2d 753 (2008) (expert testimony requires application of specialized knowledge). Thus, it should be evaluated as lay opinion testimony. Under MRE 701, a lay witness may offer an opinion that is

---

[1] Defendant argues that Lanfear's testimony did not satisfy the requirements of MRE 702 and MRE 703, the rules governing expert witness testimony. Because we conclude that Lanfear's testimony in this regard was lay opinion testimony,

we need not consider this argument. (*People v. Smith,* Mich. Ct. App. No. 282546 (August 6, 2009), slip op. at 1-2).

rationally based on her perceptions. It is improper for a witness to opine simply about the credibility of another witness as credibility determinations are the province of the jury. *People v Dobek*, 274 Mich App 58, 71; 732 NW2d 546 (2007).

In this case, Lanfear was not opining about defendant's credibility generally. Lanfear specifically stated that defendant was no longer trustworthy *to him*. He was explaining the investigation and the effect of defendant's deception on the conduct of the investigation. After defendant admitted to Lanfear that she was lying, Lanfear merely reported what effect this admission would have on his investigation. To the extent that this was opinion testimony at all, it was proper.

Respondent has attached Lanfear's testimony as Appendix O. Petitioner claims that her objection was preserved because the trial court did not rule on her objection after the prosecutor offered to phrase. This ignores the fact that the prosecutor did re-phrase and counsel did not object. Appendix O. In any event, Petitioner herself admitted lying to the police about when she had last seen Michael, giving various reasons for doing so. (TT 11/1/07, 72-74, 145-148, 167-169; TT 11/2/07, 197-198, 201-202); Appendix N.

And, contrary to Petitioner's argument that Lanfear's testimony was not limited, the Michigan Court of Appeals determined that it was. Its factual finding is entitled to the presumption of correctness under § 2254(e)(1), and Petitioner has not demonstrated by clear and convincing evidence that it was incorrect. *Sumner,* 449 U.S. at 541-552.

Moreover, there was no danger that Lanfear's opinion invaded the province of the jury when the state trial court instructed the jurors that their job was to determine the facts of the case as well as the credibility of the witnesses, including the expert and police witnesses like Lanfear. (TT 11/5/07, 138, 142-144, 147-148). The jury is presumed to follow those instructions. *Greer v. Miller,* 483 U.S. 756, 766 n 8, 107 S. Ct. 3102; 97 L. Ed. 2d 618 (1987), *reh. den.* 483 U.S.

1056, 108 S. Ct. 30, 97 L. Ed. 2d 819 (1987); *Hall v. Vasbinder,* 563 F.3d 222, 238 (6th Cir. 2009), *reh. en banc. den. and reh. den..* 2009 U.S. App. LEXIS 18701.

In sum, Lanfear's testimony did not deny Petitioner a fair trial, but explained that during her three interviews, she twice told him the same story about dropping Michael off on Tuesday night, before she told him a third story about dropping him off on Wednesday morning. Certainly Detective-Sergeant Wurtz's testimony about Michael's failure to buy a ticket, the bus schedules and the telephone records was more compelling than Lanfear's testimony about Petitioner's self-admitted lie. Ultimately, the circumstantial evidence against Petitioner, including the large area of Michael's blood in the marital home's closet hardwood floors, was overwhelming.

Petitioner is not entitled to habeas relief on this unexhausted, procedurally defaulted, and meritless claim.

**II.     This claim is unexhausted and procedurally defaulted.**

Petitioner claims that her hired investigator's testimony deprived her of a fair trial (*i.e.,* due process).  Petitioner's hired investigator testified that the investigating officers were effective and qualified, did not improperly follow leads and were competent in a general sense, even though he qualified his opinion, noting he had not looked at their case file.  (TT 11/1/07, 225, 232, 234, 240).

Petitioner's claim is unexhausted.  See Exhaustion of State Remedies, *supra.*  Even if it was not, it is procedurally defaulted.  See Procedural Default, *supra.*

In any event, it is meritless.  In March, 2004, Petitioner hired Kenneth Quisenberry, a former 25-year veteran of the Oakland County Sheriff's Department, to find Michael's killer. (TT 11/1/07, 210-211, 213-219, 222-224, 229-230, 238-239).  When Petitioner's retained trial counsel questioned Quisenberry, he implied that certain aspects of the Oakland County Sheriff's Department's investigation of Michael's murder were deficient, suggesting that Petitioner had hired Quisenberry because she was dissatisfied with it. (TT 11/1/07, 226-230, 240).  See also Appendices I and L.  The assistant prosecutor's questions were asked on redirect. (TT 11/1/07, 232, 234).  And, Quisenberry indicated that he had Detective Miller beat "by a long shot" on experience, even though Miller had handled more homicides.  (TT 11/1/07, 235).

Although Detective-Sergeant Gary Miller did not testify at Petitioner's trial, Detective-Sergeant Wurtz testified that he had 31 years of law enforcement experience.  (TT 11/2/07, 42-44, 214).  He then fully explained the lengthy investigative process undertaken after Michael's body was discovered in December 2002.  (TT 11/2/07, 45-138, 140-225, 227-295; TT 11/5/07, 5-75).

The Michigan Court of Appeals rejected Petitioner's claim of improper vouching by her expert, holding:

II. Evidence Relating to Officers' Qualifications and Competence

Defendant next argues that the prosecutor improperly elicited testimony from one witness regarding the qualifications and competence of the investigating officers in this case. We disagree.

A. Standard of Review

This issue is unpreserved because defendant failed to contemporaneously object or request a curative instruction. *Unger, supra* at 235. An unpreserved claim of prosecutorial misconduct is reviewed for plain error affecting defendant's substantial rights. *Carines*, *supra* at 763; *Unger*, *supra* at 235. "Reversal is warranted only when plain error resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings." *People v Callon*, 256 Mich App 312, 329; 662 NW2d 501 (2003). "Further, [this Court] cannot find error requiring reversal where a curative instruction could have alleviated any prejudicial effect." *Id*. at 329-330.

B. Analysis

During the investigation of this case, defendant hired a private investigator, Robert Quisenberry, to pursue alternative suspects and theories. Quisenberry was a recently retired police investigator who had worked with many of the investigating officers in this case. The prosecutor called Quisenberry as a witness at trial. On cross-examination, defense counsel questioned Quisenberry regarding the methods of the police in this case and how, hypothetically, he would have pursued the evidence in this case. Quisenberry answered that he could not answer specific questions regarding the evidence in this case because he was not privy to the same information as the police. Defense counsel also asked Quisenberry if he thought that defendant had hired him because she was unsatisfied with the conduct of the police investigation; Quisenberry responded that he thought she hired him because she was a suspect.

On redirect-examination, the prosecutor elicited evidence that Quisenberry knew two of the officers in this case. The prosecutor also asked if Quisenberry believed the officers were competent and conducted investigations competently. Quisenberry responded that, *in a general sense*, he believed that they were competent investigators. He emphasized that he had no knowledge of the officers' work in this case.

54

Defendant argues that the prosecutor's sole motive in asking Quisenberry these questions was to bolster the reputation of the officers in the minds of the jurors. Quisenberry's testimony did not vouch for the officers' credibility or truthfulness, only to their competence at their occupations. On appeal, defendant does not explain how this testimony is improper, only that it "improperly" bolstered the reputation of the officers. This questioning did not constitute plain error. (*People v. Smith,* Mich. Ct. App. No. 282546 (August 6, 2009), slip op. at 2-3.)

Petitioner continues to argue that Quisenberry "vouch[ed] for the credibility of Detective Sergeant David Wurtz, the co-officer-in-charge of this case." But, as correctly determined by the Court of Appeals, the record reveals that he did not. Petitioner has failed to show that that finding is clearly erroneous. *Sumner,* 449 U.S. at 541-552.

Moreover, as just discussed, even if she had, the state trial court instructed the jurors that their job was to determine the facts of the case as well as the credibility of the witnesses, including the police witnesses, like Detective Wurtz, whose credibility was to be judged like any other witness. (TT 11/5/07, 138, 142-144, 147-148). The jury is presumed to follow those instructions. *Greer,* 483 U.S. at 766 n 8; *Hall,* 563 F.3d at 238. Indeed, the jury was not so prejudiced that it convicted her as charged. Instead, it convicted her of the lesser charge of second-degree murder. See *e.g., United States v. Young,* 470 U.S. 1, 18 n. 15, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985).

Petitioner is not entitled to habeas relief on this unexhausted, procedurally defaulted and meritless claim.

**III.    A state court's evidentiary rulings are not cognizable unless they are so egregious that they violate due process by denying a criminal defendant fundamental fairness. The state court's properly admitted Petitioner's letters urging her long-time friend and sister to write and mail anonymous letters falsely confessing to her husband's murder to the press, the state trial court judge and her retained defense attorney.**

Petitioner claims that the state trial court abused its discretion when it admitted evidence about the anonymous letters she asked her sister and long-time friend to write, using false personas, to confess to Michael's murder.[5]  Appendices I and K through M.

Again, any alleged trial court errors in the application of state evidentiary law are generally not cognizable as grounds for federal habeas relief.  See *Estelle,* 502 U.S. 62, 67-68; *Serra,* 4 F.3d at 1354.  Only where an evidentiary ruling is "so egregious that it results in a denial of fundamental fairness," may it violate due process and warrant habeas relief.  *Bugh,* 329 F.3d at 512.

The Sixth Circuit recognizes that fabrication of evidence by a criminal defendant is admissible because it is probative of consciousness of guilt.  See *United States v. Eason,* 188 Fed. Appx. 383, 288 (6th Cir. 2006) (the defendant not only threatened the government's witnesses, but also produced a false affidavit from one of them); *United States v. Lyle,* 720 F.2d 426, 429-432 (6th Cir. 1983) (a co-defendant wrote to others asking them to assist in fabricating an alibi).

Here, the Michigan Court of Appeals rejected Petitioner's evidentiary claim, holding:

### III. Evidence of Letter

Defendant next argues that the trial court erred in admitting into evidence a letter defendant sent from her jail cell, imploring a friend to write an anonymous letter of confession to defense counsel, the press, and the trial court.  Defendant argues that the letter was not relevant and introduced merely for the purpose of portraying defendant in a negative light to the jury.  We disagree.

---

[5] Following Petitioner's conviction for Michael's murder, she pled guilty to two counts of obstruction of justice.  (T 2/2/10, 5); http://mdocweb.state.mi.us/OTIS2/otis2profile.aspx?mdocNumber=669233.

A. Standard of Review

This Court reviews a trial court's decision to admit evidence for an abuse of discretion. *People v Pattison,* 276 Mich App 613, 615; 741 NW2d 558 (2007). Preliminary questions of law are reviewed de novo. *Id.* A court abuses its discretion when it selects a course outside the range of principled outcomes. *People v Blackston*, 481 Mich 451, 460; 751 NW2d 408 (2008). Nevertheless, an erroneous evidentiary ruling does not require reversal unless it "affirmatively appear[s] that it is more probable than not that the error was outcome determinative." *People v Lukity,* 460 Mich 484, 488, 495-496; 596 NW2d 607 (1999); MCL 769.26; MCR 2.613(A); MRE 103.

B. Analysis

Evidence of "other crimes, wrongs, or acts" is inadmissible unless it is logically relevant under MRE 402, legally relevant under MRE 404(b), and its probative value is not substantially outweighed by unfair prejudice under MRE 403. *People v Knox*, 469 Mich 502, 509; 674 NW2d 366 (2004); *People v VanderVliet*, 444 Mich 52, 61-64; 508 NW2d 114 (1993).

At trial, the prosecutor presented evidence that the letter was relevant because it provided details about the crime that were consistent with the forensic evidence but not contained in public police reports. For example, the police had not considered the possibility that the killer removed the victim's pants after the murder because the killer vomited on the pants. Also, defendant indicated in her letter that the body was wrapped in a tarp, but the police theory at that time was that the body had been wrapped in linens. Further, an investigating officer testified that the police found significant the level of detail provided in the letter about acts such as loading the body into a vehicle. It is for the jury to evaluate this testimony and determine whether it establishes that the letter is evidence of defendant's guilt. *Unger, supra* at 222.

Further, any prejudice introduced by the letter does not outweigh its probative value. Unfair prejudice exists where there is a "tendency that the evidence will be given undue or preemptive weight by the jury, or when it would be inequitable to allow use of the evidence." *People v Taylor*, 252 Mich App 519, 521-522; 652 NW2d 526 (2002). The possibility of prejudice introduced by this evidence is interwoven with the jury's determination of defendant's guilt. As defendant notes, the letter could be the work of a desperate, innocent mother. On the other hand, the letter could be part of a larger scheme to lead the police away from the murderer. Not all evidence damaging to a defendant is unfairly prejudicial. Further, there is no indication that the jury would have convicted defendant of murder on the basis of her attempts to manipulate the judicial system

57

rather than the substantive evidence against her, including the contents of the letter. *Id*. at 521-522.[2]

---

[2] Defendant also argues on appeal that the prosecutor made an improper civic duty argument in his closing argument with respect to defendant's attempted manipulation of the criminal justice system. This issue is not properly before this Court because defendant failed to list it in her statement of questions presented. MCR 7.212(C)(5); *People v Brown*, 239 Mich App 735, 748; 610 NW2d 234 (2000). (*People v. Smith,* Mich. Ct. App. No. 282546 (August 6, 2009), slip op. at 3-4.)

Petitioner has not demonstrated that the admission of this evidence deprived her of a fair trial when the letters were probative of Petitioner's consciousness of guilt and not substantially more prejudicial than probative. Contrary to Petitioner's argument that the letters diverted the jury's attention from the issue of whether she killed her husband, the letters offered possible explanations for facts not known to the public, including the semi-nude condition of Michael's body, the pattern on it, how it was preserved before being dumped, and how it was moved. (TT 11/5/07, 53-55); Appendix N. Indeed, the jury was instructed to determine whether Petitioner made those statements and, if so, what weight to give them. (TT 11/5/07, 144).

Petitioner has done nothing more than challenge the state trial court's evidentiary ruling, a non-cognizable claim. Petitioner is not entitled to habeas relief.

**Certificate of Appealability**

Effective December 1, 2009, newly created Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), 28 U.S.C. foll. § 2254. In the present case, the Court should deny issuance of a certificate of appealability.

28 U.S.C. § 2253(c)(1)(A) and F.R.A.P. 22(b) state that an appeal from the district court's denial of a writ of habeas corpus may not be taken unless a COA is issued either by a circuit court or district court judge. If an appeal is taken by an applicant for a writ of habeas corpus, the district court judge shall either issue a COA or state the reasons why a COA shall not issue. F.R.A.P. 22(b). A district court is to set forth in its order all of the issues that the petitioner raised in the habeas action and identify those issues, if any, that the district court is certifying for appeal. *In Re Certificates of Appealabilit*y, 106 F. 3d 1306, 1307 (6th Cir. 1997).

In order to obtain a COA, a prisoner must make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). To demonstrate this denial, the applicant is required to show that reasonable jurists could debate whether, or agree that, the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483-484 (2000).

When a district court rejects a habeas petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims to be debatable or wrong. *Slack*, 529 U.S. at 483-484. Likewise, when a district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claims, a COA should issue, and an appeal of the district court's order

may be taken, if the petitioner shows that jurists of reason would find it debatable whether the petitioner states a valid claim of the denial of a constitutional right, and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. *Slack*, 529 U.S at 484.

When a plain procedural bar is present and the district court is correct to invoke it to dispose of the case, a reasonable jurist could not conclude either that the district court erred in dismissing the petition or that the petition should be allowed to proceed further. In such a circumstance, no appeal would be warranted. *Slack*, 529 U.S at 484.

"The issuance of a COA must not be pro forma or a matter of course" and a habeas petitioner who seeks the issuance of a COA must show more than the absence of frivolity or the presence of good faith on his or her part in order to obtain a COA. *Miller-El v. Cockrell,* 537 U.S. 322, 337-338 (2003). Finally, a habeas petitioner's conclusory assertion that jurists of reason would find his or her claims to be debatable is insufficient to warrant the issuance of a COA. See *Bagby v.* Saffle, 53 Fed. Appx. 25, 28 (10th Cir. 2002).

In this case a COA should be denied because Petitioner has not demonstrated entitlement to such relief under this standard.

**Conclusion**

For the reasons stated above, the petition should be denied. The Court should also deny Petitioner any requested discovery, evidentiary hearings, bond, oral argument, any other relief he seeks in this action, and a certificate of appealability.

Respectfully submitted,

BILL SCHUETTE
Attorney General

s/Anica Letica

Assistant Attorney General
Appellate Division
P.O. Box 30217
Lansing, MI  48909
(517) 373-4875
leticaa@michigan.gov
P38255

Dated: August 11, 2011
20110011811A/Smith, Rebecca/Answer

61

**Certificate of Service**

I hereby certify that on August 11, 2011, I electronically filed the foregoing papers with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

HONORABLE LAWRENCE P. ZATKOFF
MAGISTRATE JUDGE MONA K. MAJZOUB

and I hereby certify that Jennifer L. Sitts has mailed by United States Postal Service the papers to the following non-ECF participant

REBECCA SMITH #669233
HURON VALLEY COMPLEX - WOMENS
3201 BEMIS ROAD
YPSILANTI, MI 48197


BILL SCHUETTE
Attorney General

s/Anica Letica

Assistant Attorney General
Appellate Division
P.O. Box 30217
Lansing, MI  48909
(517) 373-4875
leticaa@michigan.gov
P38255